**REDACTED FOR PUBLIC FILING**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION** |
| | : | |
| **DEVOS LTD. d/b/a Guaranteed** | : | **NO. 14-574 (PBT)** |
| **Returns, et al.** | : | |
| | : | |

## <u>DEFENDANTS' MEMORANDUM OF LAW</u>
## <u>IN SUPPORT OF THEIR PRETRIAL MOTIONS</u>

## <u>TABLE OF CONTENTS</u>

Background ......................................................................................................... 1

Argument .......................................................................................................... 4

I.    Evidence Seized Pursuant To Constitutionally Defective Search Warrants Must Be
      Suppressed ............................................................................................... 5

      A.   All Evidence Seized Pursuant To The 2011 Warrants Must Be Suppressed Because The
           Warrants Were Unconstitutional General Warrants ............................................ 6

           1.    The 2011 Warrants Were Unconstitutional General Warrants ........................... 7

           2.    All Evidence Seized Pursuant To The 2011 Warrants Must Be Suppressed ............... 15

      B.   Defendants Are Entitled To A *Franks* Hearing Because The Woodring Affidavit, The
           Callahan Affidavit, And The Seizure Affidavit Recklessly Contained Material
           Misstatements And Omitted Material Facts ................................................... 15

           1.    Agents Woodring And Callahan Acted With Reckless Disregard For The Truth ........ 16

                 a.   The Agents Failed To Disclose Key Contractual Terms And Mischaracterized
                      Guaranteed Returns' Alleged Retention Of Indate-Related Monies ................. 17

                 b.   The Woodring Affidavit Failed To Disclose The Limited Scope Of The Company's
                      Indate Business And Misrepresented That Guaranteed Returns Was A Business
                      "Permeated With Fraud" ...................................................... 19

                 c.   The Agents' Conduct Was Reckless .............................................. 21

           2.    Agents Woodring's And Agent Callahan's Omissions And Misstatements Were
                 Material .................................................................... 24

      C.   All Evidence Seized Pursuant To The 2011 Warrants Must Be Suppressed Because The
           Warrants Were Unsupported By Probable Cause .............................................. 24

           1.    The Information Concerning The Alleged Kasper and ████████ Crimes Was Stale ... 25

           2.    The Information Concerning The Alleged "Theft" Of Indate-Related Monies Was
                 Uncorroborated Informant Hearsay ............................................ 26

           3.    There Was No Basis To Conclude That The Alleged Destruction Of Records Was
                 Done With Criminal Intent ................................................... 28

II.   The Money Laundering Conspiracy Count Must Be Dismissed .......................................... 30

      A.   The Financial Transaction Must Be "Designed . . . to Conceal" ............................. 31

i

B.   The Indictment Fails To Allege That Any Transactions Involving Proceeds Of Unlawful Activity Had Concealment As Their Purpose .................................................................. 33

   1.   Because The Indictment Affirmatively Alleges That The Refund Transactions Resulted From A Batching Process That Was A Common Industry Practice Employed For Efficiency, The Refund Transactions Cannot Support A Money Laundering Charge  35

   2.   The Deposit Of Allegedly Illegal Proceeds Into A Bank Account In A Defendant's Name Is Not Money Laundering, as a Matter of Law .................................................. 36

      a.   The Deposit Of Allegedly Illegal Proceeds Into A Bank Account In The Name Of Guaranteed Returns Is Not Money Laundering As A Matter Of Law ..................... 36

      b.   The Distribution Of The Refunds From The Guaranteed Returns Operating Account To An Account That Dean Volkes Held In His Own Name Also Fails To Constitute Money Laundering ................................................................ 37

III.   Defendants Are Entitled To A Bill Of Particulars ................................................................ 39

   A.   The Victims And Transactions Must Be Identified So That Defendants Can Prepare A Defense Based Upon The Company's Written Agreements With Customers ................. 40

   B.   The Indictment Contains No Allegations Regarding The 1999 To 2006 Time Period .... 44

   C.   The Counts Of The Indictment Alleging Obstruction And False Statements Are Devoid of Necessary Factual Allegations ....................................................................... 45

   D.   The Identity Of Alleged Uncharged Coconspirators Must Be Disclosed ........................ 46

IV.   Defendants Are Entitled To Disclosure Of Those Portions Of The Grand Jury Proceedings Relating To Conduct From 1999 Through 2006 ................................................................ 48

   A.   The Lack Of Any Allegation Regarding The 1999 To 2006 Time Period Creates A Particularized Need For The Information Requested ....................................................... 49

   B.   The Public Interest In The Secrecy of These Grand Jury Proceedings Is Minimal .......... 51

   C.   Defendants' Request Is "Carefully Tailored" To Result In Production Of Only Limited Portion(s) Of The Grand Jury Minutes ........................................................................ 53

   D.   The Need For The Limited Information Requested Well Outweighs Any Interest In Secrecy ......................................................................................................................... 54

V.   The Assets Seized By The Government Must Be Released .................................................. 56

   A.   In Light Of The Inadequacy Of The Money Laundering Count And The Government's Failure to Establish That The Seized Funds Constitute Proceeds Of Fraud, All Seized Property Must Be Released .......................................................................................... 57

      1.    The Government Has Not Adequately Traced The Seized Funds To The Alleged Fraud ............................................................................................... 58

      2.    Because The Government Has Failed To Establish That The Funds In The Accounts Are Traceable To The Alleged Fraud, They Are At Best Substitute Assets, And Are Not Subject To Pretrial Seizure .................................................................. 60

  B.    Even If The Money Laundering Count Survives, Portions Of The Property Seized As Property Allegedly "Involved In" Or "Traceable To" Money Laundering Must Be Released .............................................................................................. 60

VI.  Court Records Concerning Government Witnesses Should Be Unsealed ........................... 62

  A.    Common Law Right Of Access ................................................................... 64

  B.    First Amendment Right Of Access ............................................................. 66

VII. The Government Should Promptly Produce To Defendants *Brady* And 404(B) Material ... 67

Conclusion ........................................................................................................ 70

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bartholomew v. Pennsylvania,*
    221 F.3d 425 (3d Cir. 2000)................................................................9

*Brady v. Maryland,*
    373 U.S. 83 (1963)............................................................... passim

*Carter v. Rafferty,*
    826 F.2d 1299 (3d Cir. 1987)............................................................68

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971)......................................................................6, 7

*Costello v. United States,*
    350 U.S. 359 (1956)........................................................................50

*Cuellar v. United States,*
    553 U.S. 550 (2008)..........................................................31, 32, 33, 34

*Doe v. Groody,*
    361 F.3d 232 (3d Cir. 2004)..............................................................9

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.,*
    441 U.S. 211 (1979)............................................................... passim

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,*
    314 U.S. 95 (1941)..........................................................................10

*Franks v. Delaware,*
    438 U.S. 154 (1978)............................................................... passim

*Giglio v. United States,*
    405 U.S. 150 (1972)........................................................................67

*Globe Newspaper Co. v. Superior Court for Norfolk Cnty.,*
    457 U.S. 596 (1982)........................................................................66

*Groh v. Ramirez,*
    540 U.S. 551 (2004)........................................................................15

*Illinois v. Gates,*
    462 U.S. 213 (1983)..........................................................22, 24, 26

*In re Assets of Martin*,
   1 F.3d 1351 (3d Cir. 1993)................................................................................60, 62

*In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*,
   913 F.2d 89 (3d Cir. 1990)..........................................................................................63

*In re Cendant Corp.*,
   260 F.3d 183 (3d Cir. 2001)........................................................................................63

*In re Corrugated Container Antitrust Litig.*,
   687 F.2d 52 (5th Cir. 1982) ..................................................................................49, 52

*In re Grand Jury Matter*,
   682 F.2d 61 (3d Cir. 1982)..........................................................................................54

*Mapp v. Ohio*,
   367 U.S. 643 (1961)....................................................................................................29

*Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo.*,
   367 U.S. 717 (1961)...............................................................................................8, 15

*Marron v. United States*,
   275 U.S. 192 (1927)......................................................................................................7

*Mendoza v. U.S. Customs & Border Prot.*,
   2006 WL 2627925 (D.N.J. Sept. 13, 2006) ..............................................................61

*Nixon v. Warner Commc'ns, Inc.*,
   435 U.S. 589 (1978)....................................................................................................63

*Press-Enter.Co. v. Superior Court of Cal., Cnty. of Riverside*,
   478 U.S. 1 (1986)........................................................................................................63

*Press-Enter.Co. v. Superior Court of Cal., Riverside Cnty.*,
   464 U.S. 501 (1984)..............................................................................................63, 66

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980)....................................................................................................63

*Sanabria v. United States*,
   437 U.S. 54 (1978)......................................................................................................55

*Sullivan v. Stroop*,
   496 U.S. 478 (1990)....................................................................................................31

*United States v. $8,221,877.16 in U.S. Currency*,
   330 F.3d 141 (3d Cir. 2003)........................................................................................58

*United States v. Barrentine*,
   591 F.2d 1069 (5th Cir. 1979) ...................................................................47

*United States v. Bergrin*,
   650 F.3d 257 (3d Cir. 2011)......................................................................30

*United States v. Brien*,
   617 F.2d 299 (1st Cir. 1980) .....................................................................20

*United States v. Brodie*,
   2001 WL 849712 (E.D. Pa. June 19, 2001) .............................................43

*United States v. Cardwell*,
   680 F.2d 75 (9th Cir. 1982) ........................................................................8

*United States v. Cefaratti*,
   221 F.3d 502 (3d Cir. 2000)......................................................................38

*United States. v. Chang*,
   47 F. App'x 119 (3d Cir. 2002) ................................................................63

*United States v. Christine*,
   687 F.2d 749 (3d Cir. 1982)............................................................ passim

*United States v. Comite*,
   2006 WL 3360282 (E.D. Pa. Nov. 17, 2006) .........................................43

*United States v. Conley*,
   37 F.3d 970 (3d Cir. 1994).......................................................30, 36, 37, 38

*United States v. Criden*,
   648 F.2d 814 (3d Cir. 1986)................................................................64, 65

*United States v. Danovaro*,
   877 F.2d 583 (7th Cir. 1989) ....................................................................64

*United States v. Deerfield Specialty Papers, Inc.*,
   501 F. Supp. 796 (E.D. Pa. 1980) ............................................................43

*United States v. Delle Donna*,
   552 F. Supp. 2d 475 (D.N.J. 2008), *aff'd in part*, 366 F. App'x 441 (3d Cir.
   2010) .........................................................................................................69

*United States v. Fleet Management Ltd.*,
   521 F. Supp. 2d 436 (E.D. Pa. 2007) ..................................................13, 14

*United States v. Frumento*,
   405 F. Supp. 23 (E.D. Pa. 1975) ..............................................................48

*United States v. Gonzalez*,
   927 F. Supp. 768 (D. Del. 1996) ...............................................................63, 65, 66, 67

*United States v. Gray*,
   2014 WL 546757 (W.D. Pa. Feb. 10, 2014) ..................................................................69

*United States v. Haller*,
   837 F.2d 84 (2d Cir. 1988).............................................................................................66

*United States v. Hart*,
   513 F. Supp. 657 (E.D. Pa. 1981) ..................................................................................49

*United States v. Harvey*,
   2014 WL 940339 (E.D. Pa. Mar. 6, 2014) .....................................................................21

*United States v. Heilman*,
   377 F. App'x 157 (3d Cir. 2010) ....................................................................................26

*United States v. Herron*,
   97 F.3d 234 (8th Cir. 1996) ......................................................................................37, 38

*United States v. Higgs*,
   713 F.2d 39 (3d Cir. 1983)..............................................................................................68

*United States v. Holman*,
   490 F. Supp. 755 (E.D. Pa. 1980) ..................................................................................48

*United States v. Johnson*,
   767 F.2d 1259 (8th Cir. 1985) ........................................................................................50

*United States v. Kow*,
   58 F.3d 423 (9th Cir. 1995) ............................................................................................14

*United States v. Lightfoot*,
   2008 WL 3050300 (W.D. Pa. Aug. 5, 2008) .................................................................69

*United States v. Mahoney*,
   495 F. Supp. 1270 (E.D. Pa. 1980) ................................................................................51

*United States v. Mais*,
   2006 WL 3308429 (W.D. Pa. Oct. 30, 2006) ................................................................68

*United States v. Mangiardi*,
   962 F. Supp. 49 (M.D. Pa. 1997), *aff'd*, 202 F.3d 255 (3d Cir. 1999) ....................55

*United States v. Mariani*,
   7 F. Supp. 2d 556 (M.D. Pa. 1998) ................................................................................68

*United States v. Martin*,
746 F.2d 964 (3d Cir. 1984)........................................................................65

*United States v. Maury*,
695 F.3d 227 (3d Cir. 2012).................................................................67, 69

*United States v. McDowell*,
888 F.2d 285 (3d Cir. 1989).................................................................49, 52

*United States v. Morris*,
2008 WL 5188826 (W.D. Pa. Dec. 8, 2008).............................................47

*United States v. Ness*,
565 F.3d 73 (2d Cir. 2009)...................................................................32, 33

*United States v. O'Shea*,
447 F. Supp. 330 (S.D. Fla. 1978).......................................................48, 49

*United States v. Omoruyi*,
260 F.3d 291 (3d Cir. 2001).......................................................................31

*United States v. Panarella*,
277 F.3d 678 (3d Cir. 2002).......................................................................30

*United States v. Pavulak*,
700 F.3d 651 (3d Cir. 2012).................................................................16, 24

*United States v. Procter & Gamble Co.*,
356 U.S. 677 (1958).............................................................................49, 54

*United States v. Rankin*,
870 F.2d 109 (3d Cir. 1989).......................................................................46

*United States v. Robertson*,
305 F.3d 164 (3d Cir. 2002).......................................................................24

*United States v. Romero*,
585 F.2d 391 (9th Cir. 1978) .....................................................................50

*United States v. Rosa*,
891 F.2d 1063 (3d Cir. 1989)...........................................................39, 43, 47

*United States v. Salerno*,
2011 WL 6141017 (M.D. Pa. Dec. 9, 2011).............................................55

*United States v. Sanders*,
928 F.2d 940 (10th Cir. 1991) ...................................................................38

*United States v. Serafini,*
    167 F.3d 812 (3d Cir. 1999)....................................................................55

*United States v. Shober,*
    489 F. Supp. 393 (E.D. Pa. 1979) ........................................................53

*United States v. Sigillito,*
    759 F.3d 913 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1019 (2015)................19, 20

*United States v. Slade,*
    2013 WL 3344341 (E.D. Pa. July 3, 2013).....................................49, 53

*United States v. Smith,*
    123 F.3d 140 (3d Cir. 1997)...................................................................51

*United States v. Smith,*
    2012 WL 6697650 (E.D. Tenn. Dec. 21, 2012)....................................65

*United States v. Smith,*
    776 F.2d 1104 (3d Cir. 1985).................................................................66

*United States v. Smith,*
    787 F.2d 111 (3d Cir. 1986)...................................................................65

*United States v. Starusko,*
    729 F.2d 256 (3d Cir. 1984)...................................................................68

*United States v. Stewart,*
    185 F.3d 112 (3d Cir. 1999)...................................................................59

*United States v. Stocker,*
    1990 WL 157153 (E.D. Pa. Oct. 10, 1990)..........................................44

*United States v. Thompson,*
    545 F. App'x 167 (3d Cir. 2013) ...........................................................26

*United States v. Voigt,*
    89 F.3d 1050 (3d Cir. 1996).............................................59, 60, 61, 62

*United States v. Wander,*
    601 F.2d 1251 (3d Cir. 1979)...................................................30, 46, 47

*United States v. Webb,*
    24 F. Supp. 3d 432 (M.D. Pa. 2014)......................................................46

*United States v. Wecht,*
    484 F.3d 194 (3d Cir. 2007)...............................................63, 64, 65

*United States v. Wecht,*
    619 F. Supp. 2d 213 (W.D. Pa. 2009) ............................................................14, 65

*United States v. White,*
    541 F. Supp. 1181 (N.D. Ill. 1982) ...........................................................................8

*United States v. Williams,*
    124 F.3d 411 (3d Cir. 1997)....................................................................................25

*United States v. Williams,*
    605 F.3d 556 (8th Cir. 2010) ..................................................................................32

*United States v. Wolff,*
    840 F. Supp. 322 (M.D. Pa. 1993) ....................................................................49, 50

*United States v. Yusuf,*
    461 F.3d 374 (3d Cir. 2006)........................................................................... passim

*Washington Post v. Robinson,*
    935 F.2d 282 (D.C. Cir. 1991) ................................................................................63

*Wilson v. Russo,*
    212 F.3d 781 (3d Cir. 2000)..............................................................................21, 22

**STATUTES, RULES AND CONSTITUTIONAL PROVISIONS**

18 U.S.C. § 2 .........................................................................................................45, 55

18 U.S.C. § 371 ........................................................................................................8, 9

18 U.S.C. § 641 ........................................................................................................8, 9

18 U.S.C. § 853 ...........................................................................................................60

18 U.S.C. § 981 .....................................................................................................58, 59

18 U.S.C. § 982 ...........................................................................................................61

18 U.S.C. § 1001 .........................................................................................................45

18 U.S.C. § 1031 ......................................................................................................8, 9

18 U.S.C. § 1341 ......................................................................................................8, 9

18 U.S.C. § 1343 ......................................................................................................8, 9

18 U.S.C. § 1349 ......................................................................................................8, 9

18 U.S.C. § 1512 ..................................................................................8, 29, 45, 56

18 U.S.C. § 1519 ...................................................................................................8, 29, 45

18 U.S.C. § 1956 .................................................................................................31, 32, 36

18 U.S.C. § 1963 ...............................................................................................................60

18 U.S.C. § 3500 ........................................................................................................53, 69

18 U.S.C. § 3731 ...............................................................................................................55

28 C.F.R. § 50.9 ................................................................................................................64

Fed. R. Crim. P. 6 .............................................................................................................48

Fed. R. Crim. P. 12 ....................................................................................................30, 49

Fed. R. Crim. P. 16 ....................................................................................................52, 66

Fed. R. Evid. 404 .......................................................................................................69, 70

Fed. R. Evid. 801 ..............................................................................................................47

U.S. CONST. amend. I ...........................................................................................63, 66, 67

U.S. CONST. amend. IV .............................................................................................. passim

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (10th ed. 2014) .......................................................................10

Tammy Hinshaw, *Right of Access to Federal District Court Guilty Plea*
    *Proceeding or Records Pertaining to Entry or Acceptance of Guilty Plea in*
    *Criminal Prosecution*, 118 A.L.R. Fed. 621 (1994) ...............................................64

Defendants Devos Ltd. d/b/a Guaranteed Returns ("Guaranteed Returns" or the "Company"), Dean Volkes, and Donna Fallon (collectively, "Defendants") submit this memorandum of law in support of their pretrial motions seeking: (I) suppression of all evidence seized pursuant to constitutionally defective search warrants and a *Franks* hearing on the same; (II) dismissal of Count 34 of the Indictment charging conspiracy to launder money; (III) a bill of particulars; (IV) partial unsealing of grand jury proceedings; (V) release of assets currently subject to pretrial seizure; (VI) unsealing of court records concerning the guilty pleas of witnesses cooperating with the government; and (VII) prompt disclosure of *Brady* and 404(b) material.[1]

## BACKGROUND[2]

Guaranteed Returns is a "reverse distributor" of pharmaceutical products, meaning that it manages the returns of pharmaceutical products for healthcare providers (its "clients" or "customers") in exchange for a fee typically based on a percentage of the drugs' return value. (Indictment Count 1 ¶¶ 1, 16)  For the time period relevant to the Indictment, Dean Volkes was President and Chief Executive Officer, and Donna Fallon was Executive Vice President and Chief Financial Officer, of the Company.  (*Id.* ¶¶ 2-3)

When a healthcare provider – which includes hospitals, pharmacies, and long term care facilities – purchases an excess quantity of a drug, the excess drugs can often be returned for a refund.  (*Id.* ¶¶ 5-6)  However, each pharmaceutical manufacturer (of which there are more than

---

[1] Notwithstanding the fact that this case has been pending for nearly a full year and that the Court-ordered discovery deadline of July 17, 2015 has passed, the government has yet to complete discovery.  Defendants therefore reserve their right to supplement these motions as additional evidence is made available to them.

[2] For purposes of this factual background section *only*, Defendants assume the truth of certain cited factual allegations contained in the Indictment and in the affidavit in support of search warrants sworn out by DCIS Special Agent Joann Woodring on March 29, 2011.

a thousand in the United States) has its own return policy specifying the circumstances under which it will provide a refund for its pharmaceutical products.  (*Id.* ¶¶ 5-6)  Rather than attempting to manage returns under these varied policies, many healthcare providers utilize reverse distributors, also known as "returns companies," like Guaranteed Returns to handle their returns.  (*Id.* ¶ 8)

To do so, the healthcare provider sends its drugs to the returns company, which facilitates returns to the appropriate manufacturer.  (*Id.* ¶ 9)  For the sake of efficiency, the returns company typically combines the drugs of multiple healthcare providers into a single batch for return to a particular manufacturer.  (*Id.* ¶ 10)

Among the pharmaceutical products that health care providers sometimes provide to returns companies are products referred to in the industry as "indates."  (*Id.* ¶ 12)  Indates are drugs that are not currently returnable to the manufacturer for a refund but which may become refundable if returned to the manufacturer at a later date.  (*Id.*)

Guaranteed Returns has provided returns services to certain government entities under various contracts, including the Department of Defense ("DOD").  (*Id.* ¶¶ 22-23)  In 2008, the government began investigating what it suspected was the theft of refund checks related to a return of the drug Cipro under one such contract.  (Indictment Count 35 ¶ 2; Grover Decl. Ex. 1 ¶ 8)  The government determined that a Guaranteed Returns employee, Ryan Kasper, had caused checks properly payable to the DOD to be voided and reissued in the name of companies affiliated with Kasper and that Kasper then diverted the money for his own purposes.  (Grover Decl. Ex. 1 ¶¶ 12-13)  Kasper left the employment of Guaranteed Returns in December 2007.  (*Id.* ¶ 12)

As part of its investigation of Kasper, the government served Guaranteed Returns with a grand jury subpoena on September 14, 2009.  (Indictment Count 35 ¶¶ 4-7)  From September 2009 through February 2010, records responsive to the subpoena were provided to the government based on consultations between Company counsel and representatives of the government regarding the scope of the response.  According to the government, agents were informed that certain records were unavailable; in particular, older data from the Company's electronic inventory system, FilePro, and the electronic communications of certain former Guaranteed Returns employees (referred to in the Indictment as Person #2 and Person #3).  (*Id.* ¶¶ 10-11)

According to the government, during the pendency of the subpoena, old FilePro data was deleted and the hard drives of Person #2 and Person #3 were recovered but not provided to the government.  (*Id.*  ¶¶ 12, 13, 16)  The government claims that this was done in order to conceal a "fraudulent scheme" to retain refunds for customers' indates.  (Grover Decl. Ex. 1 ¶ 23)  As detailed herein, Guaranteed Returns' *contractual right* to retain such monies will be a central issue in this case.

On March 29, 2011, the government obtained warrants to search five locations, including Guaranteed Returns' offices and warehouses in Holbrook, New York and Ronkonkoma, New York.  (Grover Decl. Exs. 2-6)  These warrants were executed on April 5, 2011.  (*Id.* ¶¶ 3-7)

On October 24, 2014, the government obtained a warrant to search again the Company's offices and warehouse in Holbrook, New York.  (*Id.* Ex. 13)  The warrant was executed on October 29, 2014.  (*Id.* ¶ 16)

Also on October 29, 2014, the Indictment was unsealed.  The Indictment charges the following[3]:

- Mail and wire fraud by Guaranteed Returns and Volkes concerning retention of indate-related monies (Counts 1-32);

- Theft of government property by Guaranteed Returns and Volkes concerning retention of indate-related monies (Count 33);

- Money laundering conspiracy by Guaranteed Returns, Volkes and Fallon related to the purported proceeds of the charged mail and wire fraud and theft (Count 34);

- Conspiracy to obstruct justice by Guaranteed Returns, Volkes and Fallon related to the alleged concealment of the hard drives of Person #2 and Person #3 and the alleged deletion of FilePro data (Count 35)

- Obstruction of justice by Guaranteed Returns, Volkes and Fallon related to the alleged concealment of the hard drives of Person #2 and Person #3 and the alleged deletion of FilePro data (Counts 36-39, 42-43); and

- False statements by Guaranteed Returns, Volkes and Fallon regarding the availability of the hard drives of Person #2 and Person #3 and the availability of FilePro data (Counts 40-41, 44).

In accordance with the Court's September 30, 2015 order, Dkt. No. 98, Defendants now file the instant pretrial motions.

## ARGUMENT

For the reasons detailed below, Defendants respectfully move this Court for: (I) suppression of all evidence seized pursuant to constitutionally defective search warrants and a *Franks* hearing on the same; (II) dismissal of Count 34 of the Indictment charging conspiracy to launder money; (III) a bill of particulars; (IV) partial unsealing of grand jury proceedings; (V) release of assets currently subject to pretrial seizure; (VI) unsealing of court records concerning

---

[3] Ronald Carlino is also a named defendant in the Indictment.  References to Carlino are omitted in this recitation as they are not material to the motions herein.

4

the guilty pleas of witnesses cooperating with the government; and (VII) prompt disclosure of *Brady* and 404(b) material.

## I.   EVIDENCE SEIZED PURSUANT TO CONSTITUTIONALLY DEFECTIVE SEARCH WARRANTS MUST BE SUPPRESSED

On March 29, 2011, on the basis of a single affidavit sworn to by DCIS Special Agent Joann Woodring (the "Woodring Affidavit," Grover Decl. Ex. 1), the government obtained warrants to search (1) the Company's headquarters in Holbrook, New York, (2) the Company's warehouse in Ronkonkoma, New York, (3) the Company's safe deposit box at Citibank, (4) the home of then-employee ███████, and (5) the home of then-employee ███████ (the "2011 Warrants" and the "Premises," respectively). (Grover Decl. Exs. 2-6) Each warrant included an identical "Schedule B" purporting to describe the items to be seized. (*Id.*) As set out in Schedule B, the warrant authorized the seizure of all "evidence, contraband, fruits, and/or instrumentalities of violations" of nine broad federal criminal laws. (*Id.*) The warrants were executed on April 5, 2011.

On October 24, 2014, on the basis of an affidavit sworn to by FBI Special Agent Matthew Callahan (the "Callahan Affidavit," Grover Decl. Ex. 12), the government obtained another warrant to search the Company's headquarters (the "2014 Search Warrant," Grover Decl. Ex. 13). This warrant described the items to be seized as "computers, servers and computer-related equipment" containing the Company's "FilePro computerized inventory system." (*Id.*)

Also on October 24, 2014, on the basis of an affidavit sworn to by Agent Woodring (the "Seizure Affidavit," Grover Decl. Ex. 15), the government obtained a warrant to seize two bank accounts that the Indictment alleges are subject to forfeiture (the "2014 Seizure Warrant,"

together with the 2014 Search Warrant, the "2014 Warrants").  The paragraphs of the Callahan Affidavit and of the Seizure Affidavit that relate to the nature of the alleged fraud are identical.[4]

The 2014 Warrants were executed on October 29, 2014, the same day the Indictment was unsealed and Defendants were arrested.

As detailed below, the 2011 Warrants and the 2014 Warrants suffer from several independent constitutional deficiencies.  First, the 2011 Warrants were, on their face, unconstitutional general warrants and, as a result, all evidence seized thereunder must be suppressed.  Second, both the 2011 Warrants and the 2014 Warrants were obtained with affidavits containing material omissions and misstatements fundamentally undermining the purported probable cause for the Warrants.  Defendants establish herein their entitlement to a *Franks* hearing challenging the truth of the facts submitted in support of each warrant and seeking suppression of all evidence seized thereunder.[5]  Finally, even without the *Franks* issue infecting the 2011 Warrants, evidence seized thereunder must be suppressed because the 2011 Warrants were unsupported by probable cause.

A.     **All Evidence Seized Pursuant To The 2011 Warrants Must Be Suppressed Because The Warrants Were Unconstitutional General Warrants**

The 2011 Warrants were unconstitutional general warrants because they failed to describe the things to be seized with the particularity needed to prevent executing officers from engaging in an "exploratory rummaging."  *United States v. Christine*, 687 F.2d 749, 752 (3d Cir. 1982) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  By describing the

---

[4] Paragraphs 13 through 30 of the Seizure Affidavit are identical to Paragraphs 4 through 21 of the Callahan Affidavit, with the exception of a footnote in the Callahan Affidavit that discusses a piece of hardware seized in 2011.

[5] With respect to the bank accounts seized pursuant to the 2014 Seizure Warrant, Defendants seek release of the seized assets.  *See also* § V below.

things to be seized as "evidence, contraband, fruits, and/or instrumentalities of violations" of

nine expansive federal criminal laws – without any further limitation or elaboration – the 2011

Warrants vested executing agents with "unbridled discretion" to decide what to seize and what to

leave behind.  *Id.* at 753.  The 2011 Warrants therefore failed to satisfy the particularity

requirement of the Fourth Amendment and were invalid.  Accordingly, all evidence seized

thereunder must be suppressed.

### 1.        The 2011 Warrants Were Unconstitutional General Warrants

By requiring that warrants "particularly describ[e] the  . . . things to be seized," the

Fourth Amendment seeks to prevent the issuance of general warrants – i.e., warrants that

authorize "a general, exploratory rummaging in a person's belongings."  *Christine*, 687 F.2d at

752 (quoting *Coolidge*, 403 U.S. at 467));  *accord Marron v. United States*, 275 U.S. 192, 196

(1927) ("The requirement that warrants shall particularly describe the things to be seized makes

general searches under them impossible and prevents the seizure of one thing under a warrant

describing another.").  With a properly drawn warrant, adequately describing the things to be

seized, "nothing is left to the discretion of the officer executing the warrant."  *Christine*, 687

F.2d 752 (quoting *Marron*, 275 U.S. at 196).  By contrast, a warrant that "vest[s] the executing

officers with unbridled discretion to conduct an exploratory rummaging through [the

defendant's] papers in search of criminal evidence" is a general warrant and will be invalidated.

*Id.* at 753.

If the only limitation on the items to be seized under a warrant is the requirement that the

seized items be evidence of the violation of a broad criminal statute, the warrant is an

unconstitutional general warrant.  For example, the Third Circuit has recognized that warrants

permitting seizure of "smuggled goods," "obscene materials," "illegally obtained films," and

"stolen property" do not pass constitutional muster.  *See Christine*, 687 F.2d at 753.  Indeed, in

holding unconstitutional warrants permitting the seizure of "obscene material," the Supreme

Court made clear that warrants "merely repeat[ing] the language of the statute" give "the

broadest discretion to the executing officers" and are therefore constitutionally infirm.  *Marcus v.*

*Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo.*, 367 U.S. 717, 732 (1961).

Courts in other circuits have similarly invalidated warrants that describe the items to be seized

only in terms of evidence or instrumentalities of a general federal crime.  *E.g.*, *United States v.*

*Cardwell*, 680 F.2d 75, 77-78 (9th Cir. 1982) (invalidating warrant describing the items to be

seized as evidence of tax evasion); *United States v. White*, 541 F. Supp. 1181, 1185-86 (N.D. Ill.

1982) (invalidating warrant describing the items to be seized as evidence of mail fraud).  The

2011 Warrants suffer from this fatal constitutional defect.

Like the warrant descriptions in the preceding paragraph, the description in the 2011

Warrants of items to be seized was far too vague to provide executing officers any meaningful

distinction between that which they could lawfully seize and that which they could not.  The

opening paragraph of the 2011 Warrants (identical in each document) described the items to be

seized.  It directed that:

> *The items to be seized are evidence, contraband, fruits, and/or*
> *instrumentalities of violations of the following offenses occurring*
> *between March 2001 and the present*:
>
> > (a) theft of Dept. of Defense checks in violation of 18
> > U.S.C. §§ 641, 1031, 1341 and 1343;
> >
> > (b) destruction of documents and computer files in
> > violation of 18 U.S.C. §§ 371, 1512(b)(2)(B),
> > 1512(c)(l) and 1519;
> >
> > (c) a scheme to defraud the Department of Defense and
> > other customers in violation of 18 U.S.C. §§ 371, 641,
> > 1031, 1341, 1343 and 1349;

> (d) a scheme to convert funds diverted from clients . . .
> in violation of 18 U.S.C. §§ 371, 641, 1031, 1341, 1343
> and 1349;
>
> (e) a scheme to defraud pharmaceutical manufacturers
> in violation of and other customers [*sic*] 18 U.S.C.
> §§ 371, 641, 1031, 1341, 1343 and 1349. . . .
>
> including [listing, as examples, broad categories of items]

(Grover Decl. Exs. 2-6 at Sch. B (emphasis added))  In sum and substance, executing agents were told to look for "evidence, contraband, fruits, and/or instrumentalities of violations" of nine broad federal criminal laws but, besides a ten year time-frame, were given *no information* about the supposed violations to guide the search.[6]  For example, the warrants told agents nothing about the purported schemes to defraud or to convert funds (not what the alleged schemes were or even the products, non-DOD customers or manufacturers involved), nor were they given any information about the claimed criminal document destruction (not what kinds of records were involved or even when the destruction was believed to have taken place).  Instead, the 2011 Warrants merely directed agents to search for and seize evidence of mail or wire fraud (violations that are among the most unbounded of all federal crimes), obstruction of justice or money laundering, without any further meaningful detail or limitation.  This empowered agents to rummage through virtually every record and every file on the Premises and to exercise near total discretion in deciding what to take.  The 2011 Warrants are therefore indistinguishable from warrants for "smuggled goods," "obscene materials," "illegally obtained films" or "stolen

---

[6] In assessing the lack of particularity of the 2011 Warrants, the Court must consider only what is contained within the four corners of those documents and may not consider the Woodring Affidavit because the 2011 Warrants did not expressly incorporate the Woodring Affidavit, which was under seal.  *See Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004) (holding that in order for an affidavit to cure a deficient warrant, "the warrant must expressly incorporate the affidavit"); *Bartholomew v. Pennsylvania*, 221 F.3d 425, 429 (3d Cir. 2000) (sealed affidavit cannot cure deficient warrant).

property" – all recognized by the Third Circuit as constitutionally deficient.  *See Christine*, 687 F.2d at 753.

After describing the items to be seized as "evidence, contraband, fruits, and/or instrumentalities of violations" of nine broad federal criminal laws, the 2011 Warrants went on to list 13 expansive categories of items as examples of what agents might decide to seize.  By the plain language of the Warrants, this list is clearly illustrative and not limiting.  That is, it merely purports to provide examples of the kinds of "evidence, contraband, fruits, and/or instrumentalities of violations" that can be seized.  This is clear from the fact that the 2011 Warrants permit seizure of "evidence, contraband, fruits, and/or instrumentalities of violations . . . *including*" the enumerated categories of items.  (Grover Decl. Exs. 2-6 at Sch. B (emphasis added)).  The term "including" is widely understood to "connote[] simply an illustrative application of the [preceding] general principle."  *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); *accord* BLACK'S LAW DICTIONARY (10th ed. 2014).

The 2014 Warrant – which Defendants do not contend was unconstitutionally general – provides an instructive contrast.  The 2014 Warrant, like the 2011 Warrants, contained an introductory paragraph indicating that the items to be seized constituted evidence of certain crimes.  (*Compare* Grover Decl. Ex. 13 Attch. B *with* Exs. 2-6 Sch. B)  However, unlike the introductory paragraph in the 2011 Warrants, the opening paragraph of the 2014 Warrant was expressly limited by a particularized description of the items to be seized.  The 2014 Warrant provided as follows:

> Items to Be Seized
>
> The items which constitute evidence, fruit, and instrumentalities of [specified crimes] *are further described as follows*:

> Computers, servers, and computer-related equipment containing all
> records of the FilePro computerized inventory system, including
> all data, tables and records, upon which the FilePro system relies.

(*Id.* Ex. 13 Attach. B (emphasis added)).  The 2014 Warrant therefore provided executing agents with a reasonably particularized direction as to what was to be seized: the Company's FilePro inventory system.  (*Id.*)  That the scope of the Warrant was limited to the FilePro system and did not reach all "evidence, fruits and instrumentalities" of the listed crimes is clear from the phrase "are further described as follows."  The 2014 Warrant therefore did not authorize officers to exercise unbridled discretion in deciding whether or not a particular item was evidence of various federal crimes; instead, under the 2014 Warrant, officers were charged with the definite task of seizing only the computer equipment housing the FilePro system and FilePro data and thus acted with far more circumscribed discretion than the agents who executed the improper general warrants in 2011.

The list of expansive categories of items permitted to be seized under the 2011 Warrants did not provide the Warrants with constitutionally sufficient particularity not only because they were mere illustrations of what agents might decide to seize, but also because those categories are themselves not specific enough to prevent "an exploratory rummaging . . . in search of criminal evidence."  *Christine*, 687 F.2d at 753.  An officer executing the Warrants knew that he or she was authorized to look for "evidence, contraband, fruits, and/or instrumentalities of" crimes such as mail and wire fraud and obstruction of justice – crimes that could be committed in a nearly limitless number of ways – but was provided no information to guide him or her in determining what items were potential evidence of these crimes.  Indeed, the 2011 Warrants identify thirteen categories of documents which, when read together, encompassed virtually *all* of Guaranteed Returns' business records, without date, customer, or other limitation.  (*See* Grover Decl. Exs. 2-6 at Sch. B)

For example, categories one and two describe "internal correspondence" and "external correspondence . . . pertaining to or concerning the receipt and processing of returned pharmaceutical products, inventory, the receipt and processing of refunds from manufacturers, the storage, processing, destruction or crediting of 'in date' products, customer complaints, and reconciliation of items returned." (*Id.*)  Since Guaranteed Returns' business – *in its entirety* – "pertain[s] to or concern[s] the receipt and processing of returned pharmaceutical products," *see* Indictment Count 1 ¶ 1, these paragraphs of the 2011 Warrants provided no meaningful guidance to executing agents as to what, particularly, would be "evidence, contraband, fruits, and/or instrumentalities of" federal crimes.  Instead, these paragraphs encourage officers to rummage through *all* correspondence relating in *any way* to *any aspect* of Guaranteed Returns' business and to decide for themselves what might constitute such evidence.

Category three similarly provides no direction or limiting elements, encompassing "[f]or *each* customer of Guaranteed Returns, records and electronic documents . . . *relating to* the customer's contractual relationship . . . ;" in other words, every conceivable customer-related record.  (Grover Decl. Exs. 2-6 at Sch. B (emphasis added))

Although certain of the categories, viewed in isolation, might appear narrowly tailored, in fact they suffer from the same deficiency highlighted above.  That is, they permitted agents to rummage through an entire category of records with no guidance other than the unbounded instruction in the 2011 Warrants' opening paragraph to search for evidence of federal crimes.  For instance, the authority to seize evidence of any such crimes in financial reports (category 5), company policies and procedures (category 6), bank account records (category 7) and personnel records (category 8) gave agents unfettered discretion to determine which records to seize and which records to leave behind.  That is the very essence of a general warrant.

Category 13 exacerbated the deficiency, describing "[c]omputers, servers, and computer-related equipment containing the records" identified in the other categories. As detailed above, the other categories of records listed in the 2011 Warrants included essentially every conceivable business record or communication that might exist at the Company. Category 13 therefore permitted officers to look through every computer and server and through all "computer-related equipment" that might contain any Company record or communication and, without any direction, to determine what files constituted evidence of one or more of the nine federal crimes listed in the Warrants' opening paragraph. It is impossible to articulate how this could do anything other than invite "an exploratory rummaging . . . in search of criminal evidence." *Christine*, 687 F.2d at 753. Here, agents exercised this unbridled discretion and seized *every* server in the Company's central server room without regard to their function or to what information they contained. (Grover Decl. ¶ 8) Conversely, when it came to personal computers at the Company premises, agents took those belonging to 7 employees, leaving behind dozens of others. (*Id.*) Nothing in the four corners of the Warrants provided any guidance on the matter. Rather, the agents decided what they were interested in and took it.

Courts have recognized that categories of items like those listed in the 2011 Warrants do not provide the level of particularity required by the Fourth Amendment. For example, the court in *United States v. Fleet Management Ltd.* held that a warrant permitting the seizure of "[a]ny and all data in the computers or contained in the computer storage devices . . ." was an invalid general warrant because it placed "no limitation on the data to be seized" and "did not even attempt to differentiate between data that there was probable cause to seize and data that was completely unrelated to any relevant criminal activity." 521 F. Supp. 2d 436, 439, 443, 447 (E.D. Pa. 2007) (internal quotations omitted). "[T]he warrant [therefore] manifested no judicial

control over the search . . . but rather, left it entirely to the executing officers' discretion to determine what . . . could and could not be seized." *Id.* at 447. *See also United States v. Wecht*, 619 F. Supp. 2d 213, 231-32 (W.D. Pa. 2009) (warrant was unconstitutional general warrant because "[a]t the end of the day, an officer executing th[e] warrant would not be able to determine with reasonable certainty which items were being sought and would essentially have to guess" what to seize).

Similarly, in *United States v. Kow*, the court held that a warrant that "authorized the seizure of virtually every document and computer file" from the defendant's premise was an unlawful general warrant. 58 F.3d 423, 427 (9th Cir. 1995). Although the warrant provided fourteen separate categories of business records, "the warrant contained no limitations on which documents within each category could be seized or suggested how they related to specific criminal activity." *Id.* Instead, "the warrant apparently sought to describe every document on the premises and direct that everything be seized." *Id.*

Officers executing the 2011 Warrants were in precisely the same unrestricted and unguided situation, given "unbridled discretion" in determining which records should be seized. This conclusion – which flows inescapably from the face of the 2011 Warrants – is buttressed by the records that were ultimately taken. For example, officers seized:

- Dean Volkes' personal email exchanges with his daughter;

- A photo of Dean Volkes as a baby with his grandmother;

- A photo of Dean Volkes at his first communion;

- Donna Fallon's confidential divorce mediation submissions;

- A Certificate of Registration from the U.S. Patent and Trademark Office, dated January 23, 1996; and

- A notice of violation of the Brookhaven Anti-Litter Ordinance, dated July 20, 2000.

(Grover Decl. Exs. 7-11; *id.* ¶ 14)  That these and many other records with no conceivable nexus to the crimes alleged in the Woodring Affidavit were seized only confirms that the 2011 Warrants failed to provide sufficient particularity to prevent unbridled and unconstitutional rummaging.  *Cf. Marcus*, 367 U.S. at 732-33 (seizure of publications determined not to be obscene pursuant to a warrant to seize "obscene material" demonstrated constitutional infirmity).

### 2.    All Evidence Seized Pursuant To The 2011 Warrants Must Be Suppressed

Because the 2011 Warrants are unconstitutional general warrants, all evidence seized thereunder must be suppressed.  "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).  Accordingly, "[i]t is beyond doubt that all evidence seized pursuant to a general warrant must be suppressed."  *Christine*, 687 F.2d at 758; *accord United States v. Yusuf*, 461 F.3d 374, 393 n.19 (3d Cir. 2006) ("[T]he only remedy for a general warrant is to suppress all evidence obtained thereby.").

### B.    Defendants Are Entitled To A *Franks* Hearing Because The Woodring Affidavit, The Callahan Affidavit, And The Seizure Affidavit Recklessly Contained Material Misstatements And Omitted Material Facts

Separate and independent of the general warrant defect of the 2011 Warrants, Defendants are entitled to a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), challenging the existence of probable cause for the 2011 Warrants and the 2014 Warrant because both the Woodring Affidavit (the sole basis for issuance of the 2011 Warrants) and the Callahan Affidavit (the sole basis for issuance of the 2014 Warrant) recklessly contained material misstatements and omitted material facts.  Probable cause for the 2011 Warrants rested in large part on Agent Woodring's sworn statements that Guaranteed Returns was defrauding customers of their indate

15

returns, that this alleged fraud "permeated" Guaranteed Returns' business, and that Guaranteed Returns destroyed records to conceal the so-called fraud.  Similarly, probable cause for the 2014 Warrants rested on Agent Callahan's and Agent Woodring's claim that Guaranteed Returns was engaged in a fraudulent scheme to steal its customers' indates.  However, in contravention of the Fourth Amendment, both agents failed to disclose to the magistrate judge facts that directly refute these assertions, instead recklessly offering false statements about Guaranteed Returns' business.  Defendants are therefore entitled to a *Franks* hearing in order to challenge the existence of probable cause for the 2011 and 2014 Warrants.

"The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit."  *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012).  Accordingly, the Supreme Court held in *Franks* that a criminal defendant is entitled to a hearing in which to challenge facts alleged in support of a search warrant application if the defendant makes a preliminary showing (1) that the affiant knowingly or recklessly included a false statement in, or omitted facts from, the affidavit, and (2) that those false statements or omitted facts were material, i.e., necessary to the finding of probable cause.  438 U.S. at 155-56; *Pavulak*, 700 F.3d at 665; *Yusuf*, 461 F.3d at 383.  For the reasons detailed below, Defendants have made this required *prima facie* showing and are entitled to a *Franks* hearing.

### 1. Agents Woodring And Callahan Acted With Reckless Disregard For The Truth

Agents Woodring and Callahan acted with reckless disregard for the truth by failing to inform the magistrate judge of information undermining the fundamental premise of their Affidavits and, relatedly, by recklessly including false information in their Affidavits.

16

In her 2011 Affidavit, Agent Woodring characterized Guaranteed Returns' retention of indate-related monies as fraudulent:

- "Guaranteed Returns has been involved for years in a fraudulent scheme to obtain 'in-date' return product from clients and retain the corresponding manufacturers' refunds for itself."  (*Id.* ¶ 23)

She then insinuated that this "fraud" infected Guaranteed Returns' entire business:

- "Guaranteed Returns is a business permeated by fraud."  (*Id.* ¶ 2)

Finally, she claimed that Guaranteed Returns actively sought to conceal the so-called "fraud":

- "Guaranteed Returns *embarked on a record destruction campaign*, deliberately destroying years' worth of computer files that were responsive to the federal grand jury subpoena, *in order to conceal its own diversion of pharmaceutical product and refunds*."  (*Id.* ¶ 3 (emphases added))

Similarly, in their 2014 Affidavits, Agent Callahan and Agent Woodring claimed that Guaranteed Returns had "for years been involved in a fraudulent scheme *to steal* 'indate' return product from its clients and retain the corresponding manufacturers' refunds for itself" and that the computer data sought under the 2014 Search Warrant would "provide evidence of the amount of fraud proceeds . . . obtained for drug products that were *stolen*," as well as evidence that "the *fraud scheme* related to 'indate' product" had continued since the 2011 search.  (Grover Decl. Ex. 13 ¶¶ 9, 22, 26, 27 (emphases added); *id.* Ex. 15 ¶ 18)

### a.   The Agents Failed To Disclose Key Contractual Terms And Mischaracterized Guaranteed Returns' Alleged Retention Of Indate-Related Monies

In their Affidavits, both Agent Woodring and Agent Callahan utterly failed to make any mention of the written terms of service between Guaranteed Returns and its customers during the relevant time period – a staggering omission given that the terms of service directly rebut the assertion that Guaranteed Returns' alleged retention of indate-related monies was fraudulent. Had the agents accurately disclosed this highly relevant information, they would have

17

completely upended the inferences of fraud that the government pressed upon the magistrate judge.

During all periods relevant to the assertions in the Affidavits related to indates, Guaranteed Returns' provision of services to customers was, in the majority of cases, governed by the terms of a Return Authorization form ("RA form" or "RA") utilized by customers when sending pharmaceuticals to the Company.  (Meadows Decl. ¶ 5)  During the relevant time period (at least 2001 through October 2014), the RA form *allowed* Guaranteed Returns to keep refunds related to indates.  In particular, the terms of the RA forms *expressly permitted Guaranteed Returns to dispose of product in other than an "immediately creditable" state as the Company saw fit and to retain any remuneration received from manufacturers for these products*. (Meadows Decl. ¶ 6; *id.* Exs. 1-5)  This included indated product, which was not "immediately creditable" because, by definition, it was not yet eligible for return to the manufacturer. (Meadows Decl. ¶ 7).  For example, RAs in use during the relevant time period provided:

- "The service and guarantee relate only to your product that is immediately creditable in your approved program upon receipt by Guaranteed Returns. Guaranteed Returns, of course, reserves the right to dispose, remit, donate and/or otherwise receive product in other than an immediately creditable state without claim for remuneration."  (*Id.* Exs. 1-3)

- "The service and guarantee relate only to your product that is immediately creditable in your approved program upon receipt by Guaranteed Returns. Guaranteed Returns reserves the right, in its sole discretion, to dispose, remit, donate and/or otherwise receive product that Guaranteed Returns believes not to be in an immediately creditable state without claim for remuneration."  (*Id.* Exs. 4-5)

Both Agents knew or should have known about this language in the RAs.  Agent Woodring's own investigative notes demonstrate that as early as 2009 – two years before she swore out her Affidavit – she was told that pharmaceuticals sent to the Company for processing were accompanied by RA forms.  (Grover Decl. Ex. 14)  By the time that Agent Callahan swore

out his Affidavit, the government had possession of many RA forms, having seized numerous boxes of RA forms from the Company in 2011.  (Meadows Decl. ¶ 20)  Yet neither agent made any mention of these forms.

In addition, both Agents knew or should have known that Guaranteed Returns reserved the right to retain indate-related monies because, during the relevant time period, Guaranteed Returns' *publically available website* advised of this policy.  (Meadows Decl. ¶ 13; *id.* Exs. 6-11)  The following are representative examples of the policy openly publicized on the Company's website:

- "Guaranteed Returns reserves the right to dispose of your products received in other than immediately creditable state without claim for remuneration."  (*Id.* Exs. 6-7)

- "Guaranteed Returns reserves the right to dispose, remit, donate and or otherwise [*sic*] of your products received in other than an immediately creditable state without claim for remuneration."  (*Id.* Ex. 8)

- "Guaranteed Returns reserves the right to dispose, remit, donate and/or otherwise receive product in other than an immediately creditable state without claim for remuneration"  (*Id.* Ex. 9)

- "Guaranteed Returns reserves the right, in its sole discretion, to dispose, remit, donate and/or otherwise receive product that Guaranteed Returns believes not to be in an immediately creditable state without claim for remuneration."  (*Id.* Exs. 10-11)

   b.   **The Woodring Affidavit Failed To Disclose The Limited Scope Of The Company's Indate Business And Misrepresented That Guaranteed Returns Was A Business "Permeated With Fraud"**

The Woodring Affidavit also failed to disclose the limited scope of the Company's indate business.  Indeed, without factual basis, the agent advanced a directly contrary, unsupportable position: that Guaranteed Returns was a business "permeated by fraud."  (Grover  Decl. Ex 1 ¶ 2) "Permeated by fraud" is a legal concept cited by law enforcement to defend broad warrants permitting the seizure of all or substantially all of a business's records.  *See, e.g., United States v.*

*Sigillito*, 759 F.3d 913, 924 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1019 (2015).  Courts

applying this concept have required that the affidavits underlying the challenged warrant provide

a factual basis to establish probable cause to believe that the *entire* business is engaged in the

alleged fraud – i.e., that there is little or no legitimate aspect of the business.  *See id.* (probable

cause to believe that defendant's "entire business" was permeated by a continuing fraud and that

defendant rarely, if ever, was engaged in legitimate business); *United States v. Brien*, 617 F.2d

299, 307-08 (1st Cir. 1980) (probable cause, based on extensive evidence, to believe that

defendant's business was "solely and entirely" a scheme to defraud).

The Woodring Affidavit's conclusory assertion that Guaranteed Returns was a business

"permeated by fraud" appears to have been founded entirely on the Company's allegedly

fraudulent retention of indate-related monies.[7]  (Grover  Decl. Ex 1 ¶ 2)  However, in addition to

being undermined by the Company's terms of service discussed in the previous section, the

Woodring Affidavit's "permeated by fraud" claim is separately and completely undermined by

the fact that during the time period relevant to the Affidavit, the return of indated drugs

represented only a small portion (on the order of 10%) of the total volume of Guaranteed

Returns' business – another fact that the Woodring Affidavit failed to disclose.  (Meadows Decl.

¶ 21)  Thus, the Woodring Affidavit falsely represented that Guaranteed Returns was a business

"permeated by fraud" and failed to disclose the evidence that would contradict that conclusion.

---

[7] The Woodring Affidavit refers to schemes by former Guaranteed Returns employee Ryan
Kasper and certain confidential witnesses to steal refund checks belonging to the DOD, █████
█████████ and ████████████████████████████████████████████████ (Grover
Decl. Ex. 1 ¶¶ 8-13, 30-34, 35-39)  Because the Affidavit provides no basis to conclude that
Guaranteed Returns was a party to such schemes (███████████████████████████████
████████████████████████), these alleged schemes did not provide probable
cause to believe that Guaranteed Returns was a business "permeated by fraud."

### c.      The Agents' Conduct Was Reckless

The Agents' conduct detailed above can be described in either of two ways: (i) as recklessly omitting facts from their Affidavits or (ii) as recklessly including affirmative misstatements in their Affidavits.  While the legal standard for recklessness is framed slightly differently for omissions versus misstatements, the Agents' conduct was reckless under either standard.

### i.      Omissions

"[O]missions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know."  *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).  An officer therefore may not present only inculpatory evidence to the magistrate judge.  *Id.* at 787.  Rather, he or she must present all information that bears on the probable cause determination.  *United States v. Harvey*, 2014 WL 940339, at *3 (E.D. Pa. Mar. 6, 2014) (citing *Franks*, 438 U.S. at 165, 171).

A judge being asked to issue sweeping warrants based on the claims that Guaranteed Returns was engaged in a "fraudulent scheme" to retain its customers' indate-related monies, that this alleged fraud "permeated" Guaranteed Returns' business, and that Guaranteed Returns destroyed records in order to conceal this supposed fraud would absolutely "want to know," *Wilson*, 212 F.3d at 783, facts that directly rebut these contentions; namely, (i) that the Company's written terms of service on RA forms and on its publically available website expressly and repeatedly informed customers that it reserved the right to receive indates from customers without any obligation of payment and (ii) that indates were in fact only a small portion of the Company's overall business.

In the same vein, a judge being asked to issue the 2011 Warrants would "want to know" facts that directly contradict the hearsay statements of four confidential witnesses ("CWs 1-4")

21

relied upon in the Woodring Affidavit as the sole basis for characterizing the Company's retention of indate-related funds as "fraudulent."  Such evidence would bear directly on the judge's required assessment of the CWs' reliability, veracity, and basis of knowledge.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

### ii.    Misstatements

The Agents' conduct can be described not only as omitting facts from their Affidavits, but also as including misstatements therein (i.e., claiming that Guaranteed Returns' retention of indate-related monies was "fraudulent").  Under this latter characterization, the Agents' conduct also was reckless.  "[A]ssertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting."  *Wilson*, 212 F.3d at 783.

In 2011, Agent Woodring had "obvious reasons to doubt the truth" of her claim that Guaranteed Returns' retention of indate-related monies was fraudulent: namely, the RA forms and the Company's publically available website, which disclosed that the Company retained the right to receive indates from customers without any obligation of payment.  The hearsay representations of CWs 1-4, relied on so heavily in the Woodring Affidavit, do not make Agent Woodring's claim any less reckless.  (*See* Grover Decl. Ex. 1 ¶¶ 23-24)  "Informants are not presumed to be credible, and the government is generally required to show by the totality of the circumstances either that the informant has provided reliable information in the past or that the information has been corroborated through independent investigation."  *Yusuf*, 461 F.3d at 384. Nowhere does the Woodring Affidavit state that CWs 1-4 previously provided reliable information to the government.  Agent Woodring was therefore left with the obligation of corroborating the CWs' allegation – an obligation that she utterly failed to satisfy.

The most obvious and reliable method of confirming Guaranteed Return's rights and obligations vis-à-vis its customers – and therefore of corroborating the CWs' claim that the

Company's retention of indate-related monies was "fraudulent" – would have been to analyze the Company's written agreements with its customers.  As explained above, such information was readily available to Agent Woodring had she reviewed the Company's RA forms (which she knew existed) or perused Guaranteed Returns' public website.  If Agent Woodring did neither, then she acted recklessly.

In 2014, Agents Callahan and Woodring were similarly reckless in describing the Company's retention of indate-related monies as fraudulent.  The Callahan Affidavit and the Seizure Affidavit provided *no factual basis* to conclude that the Company's retention of indate-related funds breached any agreement between the Company and any particular customer.  In fact, neither Affidavit cited even the uncorroborated hearsay statements of CWs 1-4.  Given the content of the Company's publically available website and the content of the Company's RA forms – over 100 boxes of which were then in the government's possession – Agent Callahan and Agent Woodring had "obvious reasons to doubt the truth" of their assertions.

*      *      *

In sum, both Agents acted recklessly when they swore out affidavits claiming that Guaranteed Returns was defrauding customers of their indate returns, that this alleged fraud "permeated" Guaranteed Returns' business, and that Guaranteed Returns destroyed records to conceal the so-called fraud, despite the fact that in the Company's written agreements with customers and on its publically-available website, Guaranteed Returns informed customers that it maintained the right to retain indate-related monies, and despite the fact that indates were only a small portion of Guaranteed Returns' business.

23

### 2. Agents Woodring's And Agent Callahan's Omissions And Misstatements Were Material

As detailed in the previous section, the omissions and misstatements identified above are material in that they undermine the fundamental premise of the Affidavits: that Guaranteed Returns was defrauding customers of their indate refunds. Whether the Court adds to the Affidavits the omitted information or strikes the misstatements, no probable cause would remain to search for evidence of these supposed crimes.

* * *

Having made a preliminary showing that Agents Woodring and Callahan recklessly omitted facts from and included false statements in their respective affidavits, and that those omitted facts and false statements were necessary to the finding of probable cause for both the 2011 Warrants and the 2014 Warrant, Defendants are entitled to a *Franks* hearing. *Pavulak*, 700 F.3d at 665; *Yusuf*, 461 F.3d at 383.

### C. All Evidence Seized Pursuant To The 2011 Warrants Must Be Suppressed Because The Warrants Were Unsupported By Probable Cause

Even absent the omissions and misstatements detailed in the previous section, all evidence seized pursuant to the 2011 Warrants must be suppressed because the Woodring Affidavit, on its face, did not provide probable cause for the resulting warrants. A search is reasonable – and therefore compliant with the Fourth Amendment – only when "effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). Probable cause exists if, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. When reviewing a magistrate judge's finding of probable cause, a district court must assess whether there was a "substantial basis" for the magistrate's finding. *Id.* at 236.

24

The Woodring Affidavit alleged that there was probable cause to search the Premises for evidence of five supposed crimes:

1. The theft, in May 2005, by former Guaranteed Returns employee Ryan Kasper ███████████████████████████[8] of refund checks owed to a Department of Defense entity for Cipro (Grover Decl. Ex. 1 ¶¶ 4(A), 8-13);

2. ███████████████████████████████████████ *id.* ¶¶ 4(D), 30-33);

3. ████████████████████████████████ *id.* ¶¶ 4(E), 35-39);

4. The purported "theft" by Guaranteed Returns of indate-related monies (*id.* ¶¶ 4(C), 23-29); and

5. The destruction of records by Guaranteed Returns in order to conceal its supposed "theft" of indate-related monies (*id.* ¶¶ 4(B), 14-23).

However, the facts alleged in the Woodring Affidavit did not provide the requisite probable cause to search the Premises in 2011.

           **1.    The Information Concerning The Alleged Kasper and ██████ Crimes Was Stale**

Turning first to the Kasper and ██████ crimes (paragraphs 1-3 above), the information in the Woodring Affidavit concerning these alleged crimes was stale. "The age of the information supporting a warrant application is a factor that must be considered in determining probable cause." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997). "If information is too old, it may have little value in showing that contraband or evidence is still likely to be found in the place for which the warrant is sought." *Id.* ██████████████████████████

██████████████████████████████████████████████████

██████████████ (*See* Grover Decl. Ex. 1 ¶¶ 10-12, 30, 37)  Critically, nothing in the

[8] ██████████████████████████████████████████ Grover Decl. Ex 1 ¶ 12)

Woodring Affidavit supports a conclusion that as of *March 2011* – the time of the Affidavit –

evidence ███████████████████████████████ was still likely to exist at the

Premises.  Indeed, such a conclusion is directly undermined by facts in the Affidavit

demonstrating that these alleged schemes were not ongoing: namely, that the main perpetrator

(Kasper) had left Guaranteed Returns in 2007, ██████████████████████████

██████████████████████████████████████████████████████

██████████████████[9]  Accordingly, these supposed crimes did not provide probable cause to

search the Premises in 2011.

      **2.**     **The Information Concerning The Alleged "Theft" Of Indate-Related**
                    **Monies Was Uncorroborated Informant Hearsay**

Turning next to the purported "theft" of indate-related monies (paragraph 4 above), this

characterization of the Company's alleged retention of indate-related monies was improperly

based on uncorroborated informant hearsay.  When reviewing a warrant relying, whether

primarily or in part, on the statements of a confidential informant to establish probable cause, the

informant's veracity, reliability, and basis of knowledge are relevant factors for the court to

consider.  *Gates*, 462 U.S. at 238; *see also United States v. Thompson*, 545 F. App'x 167, 170

(3d Cir. 2013).  "Informants are not presumed to be credible;" rather, the government must show

that the informant has either provided reliable information in the past or that the government has

corroborated the information through independent investigation.  *Yusuf*, 461 F.3d at 384.

Accordingly, "[a] confidential informant's tip cannot support a finding of probable cause if the

warrant affidavit lacks any information about his or her reliability."  *United States v. Heilman*,

377 F. App'x 157, 193 (3d Cir. 2010).

---

[9] As noted above n.5, the Woodring Affidavit alleged no facts demonstrating that Guaranteed
  Returns participated in these supposed schemes ████████████████████████
████████████████████

The Woodring Affidavit relies exclusively on statements by CWs 1-4 to support its allegation that Guaranteed Returns' retention of indate-related monies was a "fraudulent scheme," Grover Decl. Ex. 1 ¶ 23, but gives no indication that the informants had ever provided reliable information in the past and provides no corroboration for this characterization. This is a fatal defect because absent a basis to characterize this conduct as "fraudulent," there is no evidence of a *crime* for which to search.

The corroboration failures in this respect are many. The Woodring Affidavit recited hearsay statements supposedly made by Guaranteed Returns IT department employee ███████████ to CW2 describing the Company's inventory system and the designation of some indate refunds to be sent to customers and other indate refunds to be retained by Guaranteed Returns. (Grover Decl. Ex. 1 ¶ 25) Yet the Affidavit was completely silent about a seminal point: whether the Company was contractually entitled to retain indate-related funds in the instances that it allegedly did. ███████ statements are therefore not corroborative of the claim that the Company's retention of indate-related funds was fraudulent.

This deficiency cannot be cured by ███████ related hearsay statements that the Company retained indate refunds belonging to "unmanaged" accounts because those accounts did not keep good records of their returns but passed on such refunds to "managed" accounts because those accounts kept better records. (*See id.*) Not only does the Woodring Affidavit fail to explain how ██████, an IT department employee, allegedly came by this "knowledge," but it also fails to corroborate this description of unmanaged and managed accounts. While the document excerpt in paragraph 26 of the Affidavit references an "unmanaged group," it makes no mention of

27

"managed accounts" and does not even hint at a definition for this term.[10]  (*Id.* ¶ 26)  In any

event, the characterization is irrelevant to the existence of probable cause.  Unless the Company

was contractually obligated to pass on indate-related monies to *all* of its customers (a fact not

alleged in the Woodring Affidavit), the fact that in *some instances* it passed on such funds is not

evidence that the Company acted wrongfully in the instances that it retained those funds.[11]

Finally, although CW1 allegedly "explained that when credit for 'in-date' products was

being *diverted* to Guaranteed Returns, the product was linked to 'the GRX store'" in the

Company's inventory system, *id.*, nothing in the Woodring Affidavit either explains how CW1

"knew" this or corroborates the implicit claim that the Company's retention of indate-related

funds was an improper *diversion*.  While paragraph 28 of the Affidavit describes a document

"confirm[ing] the existence of store '242' as a place for unmanaged indates and adding

additional GRX stores . . .,'" at most the paragraph confirms the existence of "unmanaged

indates" and "GRX stores."[12]  (*Id.* ¶ 26)  It sheds no light on whether Guaranteed Returns'

alleged retention of indate-related monies was fraudulent.

### 3.       There Was No Basis To Conclude That The Alleged Destruction Of Records Was Done With Criminal Intent

Turning lastly to the alleged destruction of records by Guaranteed Returns in order to

conceal its supposed "theft" of indate-related monies (paragraph 5 above), it is clear that the

---

[10] The Woodring Affidavit acknowledges that this document was stolen from the Company.
(Grover Decl. Ex. 1 ¶ 26)

[11] For the same reason, the claim that customers who inquired about indate-related funds received
those funds but that customers who did not inquire did not receive such funds, Grover Decl. Ex.
1 ¶ 29, does not demonstrate that those monies allegedly retained by Guaranteed Returns were
wrongfully retained.

[12] The Affidavit acknowledges that this document too was stolen from the Company.  (Grover
Decl. Ex. 1 ¶ 28)

Affidavit again fails to establish probable cause.  Destruction of records responsive to a federal grand jury subpoena is not criminal unless done with specific criminal intent.  *See* 18 U.S.C. §§ 1512(b)(2)(B) and 1512(c)(1) (requiring the defendant to have acted "corruptly"); 18 U.S.C. § 1519 (requiring the defendant to have "knowingly" destroyed the records "with the intent to impede, obstruct, or influence the investigation").  Without a basis to claim that Guaranteed Returns was *not* entitled to retain indate-related funds in the instances that it did, there is no basis to infer that the Company's alleged destruction of records was conducted to conceal its "theft."  In other words, there is no basis to conclude that records were destroyed "corruptly" or "with the intent to impede, obstruct, or influence the investigation."  Indeed, such an inference would be *contrary* to the statements in the Woodring Affidavit that Fallon and Carlino openly told federal agents about the deletion of certain files and explained that they were unaware they were required to preserve the information.  (Grover Decl. Ex. 1 ¶ 15)

*       *       *

In sum, the Woodring Affidavit fails to provide probable cause to believe that evidence of any of the five "crimes" alleged in the Affidavit would be found at any of the Premises.[13] Accordingly, all evidence seized under the 2011 Warrants must be suppressed.  *See Mapp v. Ohio*, 367 U.S. 643, 648 (1961).

---

[13] To the extent the government contends that at worst the 2011 Warrants were overbroad but that there was probable cause to search for evidence of some subset of these five "crimes," the 2011 Warrants were nonetheless constitutionally deficient in that the scope of the search and seizure they authorized far exceeded any "ambit of probable cause" established by the Woodring Affidavit.  *See Christine*, 687 F.2d at 753 ("The Fourth Amendment dictates that a magistrate may not issue a warrant authorizing a search and seizure which exceeds the ambit of the probable cause showing made to him.").  Because the 2011 Warrants reached so far beyond the scope of any such probable cause, all evidence seized thereunder must be suppressed.  *Id.* at 759 ("If the overall tenor of the warrant or search smacks of . . . an abuse of the prospective availability of redaction, then the entire search and seizure may be treated as a single illegality.").

29

## II.    THE MONEY LAUNDERING CONSPIRACY COUNT MUST BE DISMISSED

Count 34 of the Indictment, which alleges that Defendants conspired with one another to engage in concealment money laundering, must be dismissed because it fails to charge an essential element of the crime: that the financial transactions in question were *designed to conceal* the nature, location, source, ownership or control of criminal proceeds.

If an indictment fails to charge an essential element of the crime, it fails to state an offense, and the deficient count must be dismissed.  *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979).  In determining whether an indictment validly alleges an offense, a court need not blindly accept a recitation of the statutory language.  *United States v. Panarella*, 277 F.3d 678, 684-85 (3d Cir. 2002).  Rather, "Federal Rule of Criminal Procedure 12(b)(3)(B) allows a district court to review the sufficiency of the government's pleadings . . . [to] ensur[e] that legally deficient charges do not go to a jury."  *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011).  "[I]f the specific facts" alleged in the indictment "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation," then the indictment fails to state an offense.  *Panarella*, 277 F.3d at 685.

To this end, the Court must "ascertain[ ] whether the conduct alleged as the object of the conspiracy would, if completed, constitute a violation of the substantive money laundering statute."  *United States v. Conley*, 37 F.3d 970, 978 (3d Cir. 1994).  Here, where concealment money laundering is the purported object of the conspiracy, this means determining whether the Indictment alleges: (1) an actual or attempted financial transaction; (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and, most important for purposes of this motion; (4) *knowledge that the transactions were designed in whole or in part to conceal* the nature, location, source,

ownership, or control of the proceeds of specified unlawful activity.  18 U.S.C. §

1956(a)(1)(B)(i); *United States v. Omoruyi*, 260 F.3d 291, 294–95 (3d Cir. 2001).

      Although Count 34 is hardly a paragon of clarity, it appears, as best as can be deciphered,

that the government may be relying on either of two categories of alleged financial transactions

to support its money laundering conspiracy charge: (1) the "batching" of allegedly stolen indated

drugs with other drugs, thereby allegedly causing "batched" refund checks to be issued; or (2)

receipt of the proceeds of the alleged indate fraud into a Guaranteed Returns operating account

and the subsequent transfer of the same to a bank account held in the individual name of

defendant Dean Volkes.[14]  However, as detailed below, the Indictment falls well short of

alleging that either category of financial transaction had concealment as its purpose or

design.  Count 34 therefore fails to state an element of the offense of money laundering

conspiracy and must be dismissed.

### A.      The Financial Transaction Must Be "Designed . . . to Conceal"

      The Supreme Court has recently clarified the statutory requirement that the financial

transactions in a money laundering prosecution be *designed* to conceal.  In *Cuellar v. United

States*, the Court unanimously reversed a money laundering conviction, holding that the statute

under which the petitioner was convicted requires proof that the conduct at issue was "*designed

in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership,

or the control*" (the "listed attributes") of the funds.[15]  553 U.S. 550, 563 (2008) (emphasis

––––––––––––––––––––

[14] At the very least, the Indictment's failure to identify clearly the completed or contemplated financial transactions alleged to constitute money laundering must be remedied by a bill of particulars so that Defendants may prepare for and avoid surprise at trial.

[15] While *Cuellar* dealt with so-called "transportation money laundering" rather than concealment money laundering, the relevant statutory language is identical for both provisions, and therefore the phrase "designed . . . to conceal" must be interpreted in the same way for both provisions. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (noting the "normal rule of statutory

added).  The Court explained that the word "'design' means purpose or plan"; in other words, the

purpose or plan of the conduct must be to conceal the listed attributes of the funds.  *Id.*  The

Court explicitly distinguished the *intent* of the conduct from the *effect* of the conduct, holding

that even conduct that has the effect of concealing funds does not rise to the level of concealment

money laundering if secrecy was not the purpose of the conduct.  *Id.* at 566-67.  As the Court

stated, "merely hiding funds during transportation is not sufficient to violate the statute, even if

substantial efforts have been expended to conceal the money."  *Id.* at 563.  Because the evidence

showed only that Cuellar's actions had the *effect* of concealing the funds, rather than that

concealment was the *purpose* behind his conduct, the Court reversed Cuellar's conviction as

inconsistent with the elements of the money laundering count that had been charged.  *Id.* at 568.

Although the Third Circuit has not yet had occasion to explore *Cuellar* in depth, other

courts of appeals have done so, reversing money laundering convictions where the charged

conduct had the *effect* of concealing funds, but where the facts did not support a conclusion that

the concealment had been *by design* or otherwise *purposeful*.  In *United States v. Ness*, for

example, the Second Circuit reversed a money laundering conviction that arose from the

defendant's ownership of an armored car carrier business that commingled the proceeds of a

client's drug distribution ring with the cash and valuables of other clients when transporting

those items overseas.  565 F.3d 73 (2d Cir. 2009).  The court analyzed the evidence adduced at

trial of the defendant's "scrupulous avoidance of any paper trail, his surreptitious shipment of the

money by hiding it in packages of jewelry for shipment, and his use of code words for delivery

---

construction that identical words used in different parts of the same act are intended to have the
same meaning" (citations and quotation marks omitted)); *see also United States v. Williams*, 605
F.3d 556, 564-65 (8th Cir. 2010) (applying *Cuellar* to concealment money laundering charge
under § 1956(a)(1)(B)(i)).

of the funds." *Id.* at 77–78.  The court determined that, under *Cuellar*, these acts of obfuscation

did not constitute money laundering:

> While such evidence may indicate that [the defendant] was concealing the nature, location, or source of the narcotics proceeds, it does not prove that his purpose in transporting the proceeds was to conceal these attributes.  *It evidences not "why" he moved the money, but only "how" he moved it.*  [The defendant's] avoidance of a paper trail, hiding of the proceeds in packages of jewelry, and use of code words show only that he concealed the proceeds in order to transport them.  Under *Cuellar*, such evidence is not sufficient to prove transaction or transportation money laundering offenses.

*Id.* at 78 (emphasis added).  In other words, the Second Circuit held that the rule in *Cuellar*

requires courts to distinguish between those situations in which conduct *results* in concealment

and those in which the conduct's *purpose* was to conceal.

The case law is clear.  In order to state the elements of money laundering, an indictment

must allege that the transaction at issue was *designed* to conceal the nature, location, source,

ownership or control of the proceeds of a crime.  An indictment that does not do so, or that

alleges only that one or more of these attributes of the funds were *in fact* concealed by the

transaction, is deficient and must be dismissed.

### B.      The Indictment Fails To Allege That Any Transactions Involving Proceeds Of Unlawful Activity Had Concealment As Their Purpose

The Indictment fails to allege that any financial transaction contemplated or completed by

Defendants was "designed to conceal" the attributes of funds that were the proceeds of the

alleged indate fraud.  As noted above, the allegations of money laundering in the Indictment are

difficult, if not impossible, to parse.  This difficulty arises, at least in part, because the Indictment

does not make clear which financial transaction or transactions underlie the alleged money

laundering.  From the vague and ill-defined allegations in the Indictment, two categories of

financial transactions can be identified as potentially underlying the government's money

laundering conspiracy charge.

33

The first type of transaction is the "batching" of allegedly stolen indate drugs and the receipt of "batched" checks. The Indictment describes the "batching" process as follows: "GUARANTEED RETURNS would 'batch,'" or combine, "the return products from numerous clients and send them to the manufacturers. The manufacturers would then issue payment to . . . defendant GUARANTEED RETURNS." (Indictment Count 1 ¶ 45.) The batched returns allegedly included stolen indates, which meant that the batched refunds would have included refunds for the allegedly stolen indates together with refunds for other products. (*Id.*) For the purpose of this motion, these alleged transactions are referred to as the "Refund Transactions."

The second type of transaction that, based on the allegations in the Indictment, may underlie the government's money laundering theory is the distribution of funds from Guaranteed Returns to Volkes. The Indictment alleges that when Guaranteed Returns received refunds from manufacturers, the money was placed into the Guaranteed Returns operating account.[16] (*Id.* ¶ 47) From there, the money went to one of two places: (i) some of the refund was sent to customers; and (ii) the funds related to supposedly stolen indates were retained "temporarily in the Guaranteed Returns operating account, and then distributed . . . to defendant VOLKES." (*Id.*) For purposes of this motion, these alleged transactions are referred to as the "Distribution Transactions."

As a matter of law, neither of the two categories of financial transactions constitutes concealment money laundering, requiring that Count 34 be dismissed.

---

[16] The refunds typically did not flow directly from manufacturers to Guaranteed Returns, but instead were sent from manufacturers to wholesalers, which then disbursed the refunds to Guaranteed Returns. (Indictment Count 1 ¶¶ 45, 48) Other refunds were never even sent to Guaranteed Returns, but were instead sent directly from the manufacturers to the customers on whose behalf Guaranteed Returns had returned the products. (*Id.*)

1.      **Because The Indictment Affirmatively Alleges That The Refund Transactions Resulted From A Batching Process That Was A Common Industry Practice Employed For Efficiency, The Refund Transactions Cannot Support A Money Laundering Charge**

If the government is in fact basing its vague money laundering allegations on the Refund Transactions, the money laundering charge fails because the Indictment does not and cannot allege that the Refund Transactions were designed to conceal the "nature, location, source, ownership or control of" criminal proceeds.

In the Indictment, rather than alleging that the batching of pharmaceuticals was intended to conceal, the government affirmatively asserts that the "batching process," by which multiple clients' products were combined into a single return, was employed "[f]or the sake of efficiency." (Indictment Count 1 ¶ 10.) In fact, the Indictment makes clear that batching was an *industry-wide tool* used by reverse pharmaceutical distribution companies such as Guaranteed Returns. (*Id.*) Thus, far from alleging that Defendants utilized batched returns for purposes of concealment or any other nefarious aim, the Indictment affirmatively alleges only that Defendants did so for the sake of efficiency.

The Indictment also alleges that the batched returns resulted in combined or "batched" refund checks from the manufacturers. (*See id.* ¶ 45.) However, the Indictment does not allege that the goal of Defendants in batching their returns was to influence the way in which manufacturers issued refund checks. To the contrary, the only possible conclusion from the Indictment is that, in the Refund Transactions, the combination of what the government apparently perceives as "stolen" and "clean" funds was the natural result of the batching together of various clients' returns, which itself was implemented for the legitimate purpose of efficiency.

The Indictment's statement that batching was an industry-wide practice done for the sake of efficiency is therefore fatal to any money laundering theory predicated on the Refund

35

Transactions because it vitiates the argument that the Refund Transactions were designed or employed in order to conceal the "nature, location, source, ownership or control" of funds conveyed via the refund checks.

> **2.     The Deposit Of Allegedly Illegal Proceeds Into A Bank Account In A Defendant's Name Is Not Money Laundering, as a Matter of Law**

The Indictment's other potential theory of money laundering – that allegedly illegal proceeds were laundered by having been received into an operating account of Guaranteed Returns and then transferred to a bank account that Volkes held in his own name – is no more viable than the first potential theory.  Simply put, neither transaction in this potential two-step theory of money laundering has been alleged, nor can be alleged, to involve a purpose to conceal.

> **a.     The Deposit Of Allegedly Illegal Proceeds Into A Bank Account In The Name Of Guaranteed Returns Is Not Money Laundering As A Matter Of Law**

The Third Circuit has determined that a transaction by which allegedly illegal proceeds are deposited into a bank account in the name of a defendant will not, as a matter of law, constitute concealment money laundering.  *Conley*, 37 F.3d at 979.  The requirement that the transaction forming the basis of a money laundering charge be "designed to conceal . . . preclude[s] the application of section 1956 to *non-money laundering acts* such as *a defendant's depositing the proceeds of unlawful activity in a bank account in his own name* and using the money for personal purposes."  *Id.* (citation omitted) (emphases added).  The conduct alleged in the Indictment – the receipt of alleged criminal proceeds into a bank account that is correctly and legitimately held in the name of the corporate defendant – is precisely the type of conduct deemed a "non-money laundering act[ ]" by *Conley*.  Therefore, a money laundering count

founded upon Guaranteed Returns' receipt of batched refund checks cannot survive as a matter of law.

> **b.    The Distribution Of The Refunds From The Guaranteed Returns Operating Account To An Account That Dean Volkes Held In His Own Name Also Fails To Constitute Money Laundering**

The next transaction in the two-step process that potentially forms a basis for the government's vaguely defined money laundering theory appears to be the alleged transfer of funds from the Guaranteed Returns operating account to Volkes' personal bank account.[17] Nothing in the Indictment alleges, however, that these transactions were designed to conceal, nor indeed would they have been effective at concealment.  Rather, as alleged in the Indictment, the transactions constitute a straightforward and transparent "distribut[ion]" of funds from Guaranteed Returns to its owner – in an account in his own name – without any attempt to obscure either the sender or the recipient of the distribution.  These are, again, the type of transactions that the Third Circuit in *Conley* deemed "non-money laundering acts."  *Conley*, 37 F.3d at 979.

Other courts of appeals that have confronted the same issue have likewise determined that such transactions do not, as a matter of law, constitute money laundering.  For example, in *United States v. Herron*, the Eighth Circuit reversed a money laundering conviction where the "concealment" proven by the government was that the defendant had wired money across state lines to a bank account in his own name.  97 F.3d 234 (8th Cir. 1996). The court explained:

---

[17] Although the Indictment does not explicitly state that the funds were sent to Volkes' bank account (*see* Indictment Count 1 ¶ 47 (alleging the money was retained "temporarily in the GUARANTEED RETURNS operating account, and then distributed . . . to defendant VOLKES")), the Indictment contains a forfeiture allegation against a bank account in the name of Dean Volkes.  The only reasonable inference is that the government believes that allegedly misappropriated funds were sent to that account.

What is lacking in this record is any evidence that the appellants' transactions were designed in whole or in part to conceal or disguise their drug proceeds. As demonstrated by the appellants' handwriting samples, they used their own names when sending the money to Chicago, and there is no evidence to suggest that the money was received by any persons other than those named in the Western Union records. Without any evidence of concealment, it is impossible to find that appellants knew of such a design.

*Id.* at 237.

The Tenth Circuit confronted an even more attenuated version of this type of transaction in *United States v. Sanders*, a case in which a father was alleged to have laundered drug proceeds by purchasing a car in his daughter's name. 928 F.2d 940, 946 (10th Cir. 1991). There, the court determined that, because the defendant had publicly associated himself with the car in various ways, the mere fact that the car was purchased in the daughter's name did not constitute concealment. *Id.* (holding that "the daughter's presence in person at the car lot during or somewhat subsequent to the transaction, the fact that the daughter shared defendant's last name, and defendant's and his wife's conspicuous use of the car after the purchase, undermine the government's argument (based in large part upon defendant's titling of the car in his daughter's name) that the [car] purchase involved the requisite design of concealment").[18]

In sum, the case at bar presents a money laundering charge that is indistinguishable from the defective charges in *Conley*, *Sanders*, *Herron*, and their progeny. The funds in question were allegedly received into the Company's general operating account (a company that Volkes openly owns) and were then transferred to an account that Volkes held in his own name. (*See*

_____

[18] The concern driving the holding in *Sanders* was that "the government's argument that the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity . . . would, in the court's view, turn the money laundering statute into a 'money spending statute.'" *Sanders*, 928 F.2d at 946. The Third Circuit has expressly acknowledged and agreed with the Tenth Circuit's discussion in *Sanders*, expressing strong policy reservations against the government's trend toward arguing that ordinary business conduct, such as profit-taking, constitutes money laundering. *See, e.g.*, *United States v. Cefaratti*, 221 F.3d 502, 513 (3d Cir. 2000).

Indictment Count 1 ¶ 47.)  Nothing could be clearer, and there is simply no evidence of concealment, let alone any evidence that the transfers were *designed* to conceal the source, nature, or any other aspect of the funds.

*      *      *

The Indictment fails to allege facts that, if true, would constitute concealment money laundering because it fails to allege that Defendants' alleged contemplated or completed financial transactions were "designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of" the alleged indate fraud.  Accordingly, Count 34 must be dismissed.

## III.    DEFENDANTS ARE ENTITLED TO A BILL OF PARTICULARS

Defendants are entitled to a bill of particulars.  A defendant's motion for a bill of particulars "should be granted whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial."  *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989).  Such a bill is required, in the circumstances of this case, with respect to four distinct aspects of the Indictment.

First, the facts alleged in the Indictment are entirely insufficient to permit Defendants to prepare their defense regarding the transactions alleged in Counts 1 through 32 to be fraudulent – each of which could involve dozens or hundreds of customers.  Defendants' defense at trial will rest in part upon its written agreements with customers; therefore, in order to prepare for trial, Defendants must explore the circumstances of each allegedly fraudulent transaction, including the contractual terms that governed that particular transaction with that particular customer.  In order to do that in a meaningful way, Defendants must know which customers the government alleges were defrauded and which transactions are alleged to be fraudulent.

39

Second, although the Indictment alleges that the conspiracy unfolded over the course of thirteen years (from 1999 to 2011), it simultaneously describes the fraud as consisting of three "stratagems," the earliest of which allegedly came into being in February 2007.  (Indictment Count 1 ¶¶ 27-39, 50)  The Indictment provides no information as to how, if at all, Defendants carried out any theft for the eight years prior to the inception of the earliest "stratagem," thereby rendering necessary a bill of particulars to that effect.

Third, as to the obstruction and false statements counts (Counts 36 through 44), the Indictment appears to allege two separate and distinct courses of conduct: one having to do with the hard drives of former employees that were allegedly concealed from the government and one having to do with the alleged deletion of FilePro data.  The Indictment fails, however, to make any factual allegations connecting defendant Volkes to the hard drives or defendant Fallon to the FilePro data.  A bill of particulars is required to describe the conduct of each defendant, if any, that the government alleges violated the law.  In the alternative, these counts should be dismissed as against the defendant with regard to whom no facts are alleged (i.e., Counts 36 through 41 for Volkes and Counts 42 through 44 for Fallon) for failure to state a claim.

Fourth, as to the counts charging money laundering and obstruction of justice conspiracies (Counts 34 and 35), the Indictment asserts that Defendants conspired with "others known and unknown" but does not list the "others" with whom Defendants allegedly conspired. The government should be compelled to provide this information.

### A.     The Victims And Transactions Must Be Identified So That Defendants Can Prepare A Defense Based Upon The Company's Written Agreements With Customers

Counts 1 through 32 of the Indictment charge mail and wire fraud based upon an alleged scheme, from 1999 through 2011, to retain indate-related monies owed to customers.  The Indictment identifies 18 wire transmissions (between December 31, 2009 and February 1, 2011)

40

and 14 mailings (between December 16, 2009 and February 11, 2011) allegedly furthering this conduct.  (Indictment Count 1 ¶ 51; *id.* Count 19 ¶ 3)  These allegations do not disclose which of the Company's hundreds of clients were supposedly victims of the scheme nor do they disclose the particular customer transactions at issue.

The identity of the alleged victims is critical to Defendants' defenses to mail fraud and wire fraud and money laundering conspiracy.  Defendants intend to argue that customers who allegedly were not credited for returned indates had entered into agreements with Guaranteed Returns – either through written contracts or Return Authorization forms – permitting Guaranteed Returns to retain indate-related monies.  The defense will turn on the specific agreements and communications between the Company and the individual customers at issue. Defendants must identify and analyze at least the following as to each customer that the government alleges to be a "victim": (1) that customer's agreement(s) with the Company; (2) emails, mailings or other communications concerning the terms of the customer's agreement(s) with the Company; (3) the terms of service posted on the Company's website at the date of each transaction alleged to be fraudulent; and (4) documents sufficient to determine whether proceeds from returned indates were sent to the customer or retained by the Company.  These critical factors will vary from client to client.  Moreover, some clients may have engaged in some transactions under one form of agreement and other transactions under a different form of agreement.  Given the volume of clients and the varying nature of each client relationship, it is simply impossible for Defendants to prepare their defense without being informed of the identity of each customer alleged to be a "victim" and the specific transactions that the government claims were fraudulent.

41

The Indictment entirely fails to provide the needed information.  Although it appears to name five clients as "victims" (the Defense Supply Center of Philadelphia, the DOD, the Veterans Administration, the District of Columbia Department of Health, and the Federal Bureau of Prisons), many of the allegations in the Indictment appear to sweep more broadly and relate to other clients. (Indictment Count 1 ¶ 14; *id.* Count 33 ¶ 2)  For example, it  alleges that Defendants "stole a significant amount of the clients' indated drug products" and kept the related refunds, without limiting that charge to the five identified governmental clients. (*See* Indictment Count 1 ¶ 24; *see also id.* ¶¶ 25-26 (alleging that Guaranteed Returns implemented certain computerized coding for "each healthcare provider client"))  Thus, it appears that the government is relying on transactions with numerous unidentified clients – and whether that number is dozens, scores or hundreds is impossible to tell from the Indictment.[19]

The 32 communications identified in the Indictment do not cure this deficiency because they are communications with manufacturers and wholesalers, which could have related to any number of customers.   The Indictment itself acknowledges that, for the sake of efficiency, Guaranteed Returns combined the drugs that customers returned to the Company into batches grouped by manufacturer and then sent those batches to the appropriate manufacturer. (Indictment Count 1 ¶ 10)  Accordingly, a communication with a manufacturer or wholesaler about a batch could in fact relate to dozens or even hundreds of customers.  The communications identified in the Indictment therefore provide insufficient guidance as to which customers the government alleges to have been defrauded.

---

[19] If the government is, in fact, relying exclusively on the entities it has named as victims in the Indictment, then it should say so, as this would limit Defendants' application to identification of the specific transactions with those five entities alleged to be fraudulent.

Courts faced with similarly uninformative indictments have not hesitated to require the government to provide further detail to the defense.  In *Rosa*, where the government alleged that the defendants had participated in a continuing criminal enterprise, the court directed that "defendant should be advised prior to trial of the individuals claimed by the government to be controlled persons so that he or she may prepare a defense and avoid surprise at trial."  891 F.2d at 1066.  In *United States v. Brodie*, a prosecution for concealing material facts from customs agents, the court directed the government to provide a bill of particulars specifying "what documents [the agents had] requested and what documents [the defendants allegedly] withheld." 2001 WL 849712, at *1 (E.D. Pa. June 19, 2001).  In *United States v. Deerfield Specialty Papers, Inc.*, a criminal antitrust case, the government was directed to provide a bill of particulars detailing the types of unlawful agreements alleged to have been reached.  501 F. Supp. 796, 808, 811 (E.D. Pa. 1980).  And, in *United States v. Comite*, a case involving an alleged scheme to defraud health care benefit programs, the court found that a bill of particulars was not necessary only because each of "the 82 specific counts in the indictment contain[ed] pertinent information as to the date of the claim, the patient to whom services were rendered, the health care benefit program, the claim number, the approximate amount that was billed, and a reason why the claim [was] false."  2006 WL 3360282, at *7 (E.D. Pa. Nov. 17, 2006).  The level of detail that courts have deemed necessary to permit defendants to prepare a defense in cases involving multiple transactions and voluminous records is comparable to the information Defendants seek here: identification of the alleged victims and the transactions with them alleged to be criminal.

Furthermore, because the government seized millions of pages of records and more than seven terabytes of computer data relating to the Company's business, the mass of documents

produced in discovery cannot give Defendants the level of particularized information needed in order adequately to prepare for trial.  Courts have ordered a bill of particulars in similar circumstances.  For example, in *United States v. Stocker*, a case concerning drug distribution, the court determined that "disclosure by the government of 'mountains of documents' is not an adequate substitute for a bill of particulars when the disclosure does not provide guidance regarding what the government would prove at trial."  1990 WL 157153, at *1-2 (E.D. Pa. Oct. 10, 1990).  The court therefore ordered the government to provide guidance to the defendant as to "where to search in the sea of documents for the particular allegations against which he must defend."   In the same way, here there simply is no way to locate the subset of relevant documents in the government's massive production without knowing who the alleged victims are; even then, details regarding the particular transactions at issue are necessary as well.

In sum, the Court should direct the government to provide a bill of particulars identifying the victims that the government claims were defrauded, as well as the transactions alleged to be fraudulent, in order to permit Defendants to prepare for and avoid surprise at trial.

### B.     The Indictment Contains No Allegations Regarding The 1999 To 2006 Time Period

Defendants further move for a bill of particulars as to the scheme to defraud alleged in Counts 1 through 32, specifically with respect to the time period between 1999 and 2006. Athough the Indictment describes certain allegedly fraudulent "stratagems" that purportedly began in 2007, the Indictment makes no factual allegations regarding the eight preceding years. To the extent the government intends to assert at trial that there was fraudulent conduct during those years, Defendants have no notice of what that conduct might be.

Defendants are entitled to know whether the government intends to argue at trial that there was any fraudulent conduct prior to 2007, and if so, what conduct or transactions the

government intends to argue were fraudulent, or how the fraud was allegedly carried out.

Without a bill of particulars providing the factual allegations that underlie the Indictment's

incorporation of the 1999 to 2006 time period, Defendants will be unable to prepare for trial and

will be utterly surprised by whatever the government's theory of this portion of the case turns out

to be.  In such situations, district courts readily order, and the Third Circuit readily affirms, the

production of a bill of particulars.

> ### C.    The Counts Of The Indictment Alleging Obstruction And False Statements Are Devoid of Necessary Factual Allegations

Defendants further move for a bill of particulars with regard to Counts 35 through 44 of

the Indictment, which charge obstruction of justice and aiding and abetting such obstruction

pursuant to 18 U.S.C. §§ 1512(c)(1), 1519 and 2; false statements pursuant to 18 U.S.C. §§

1001(a)(1) and (a)(2); and conspiracy to commit the said offenses.  Counts 36 through 41

constitute obstruction and false statements charges relating to certain hard drives which were

allegedly concealed from the government.  Counts 42 through 44 constitute obstruction and false

statements charges relating to certain data that was allegedly deleted from the Company's

internal record-keeping system known as FilePro.  Count 35, the conspiracy count, sets forth the

purported factual background for Counts 36 through 44.

The Indictment is prejudicially vague in its recitation of the factual basis for the

substantive charges in Counts 36 through 44.  Despite charging all Defendants in all counts, the

Indictment contains no information whatsoever as to how Volkes may have participated in or

aided and abetted the alleged concealment of the hard drives, nor any information as to how

Fallon may have participated in or aided and abetted the alleged deletion of data from the FilePro

system.  The only allegation that purports to link Volkes to the concealment of the hard drives or

Fallon to the deletion of FilePro data is the conclusory statement that "defendants . . . asserted

that GUARANTEED RETURNS maintained only three years of inventory records related to the returns transactions on the FilePro inventory control system [and] asserted that they could not provide the [hard drives]." (Indictment Count 35 ¶ 11.) This assertion is wholly insufficient to permit Defendants to know what specific conduct the government alleges to underlie the offenses charged in these counts.

Finally, to the extent that the Court determines that Counts 36 through 44 contain insufficient factual allegations, it may in the alternative dismiss those counts as to the defendant(s) with regard to whom the counts are insufficient. Although an indictment need generally provide "no greater specificity than the statutory language," an indictment must contain "sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989) (emphasis added). In this case, as described above, Counts 36 through 41 contain insufficient factual orientation as to Volkes, and Counts 42 through 44 as to Fallon. Those counts must therefore be dismissed as to the appropriate defendant. *See, e.g.*, *United States v. Webb*, 24 F. Supp. 3d 432 (M.D. Pa. 2014).

Defendants therefore respectfully request that the Court direct the government to provide a bill of particulars setting forth the factual basis to charge Volkes with the conduct forming the basis of Counts 36 through 41, and the same with regard to Fallon's involvement in Counts 42 through 44, so that Defendants may properly prepare for trial and avoid prejudicial surprise. In the alternative, these counts should be dismissed for failure to state an offense. *See Wander*, 601 F.2d at 1259.

      **D.**    **The Identity Of Alleged Uncharged Coconspirators Must Be Disclosed**

Counts 34 and 35, which charge Defendants with money laundering conspiracy and conspiracy to obstruct justice, both charge that Defendants "conspired and agreed, together *and*

with others known and unknown . . . ." (Indictment Count 34 ¶ 3 (emphasis added); *id.* Count 35
¶ 23 (emphasis added))  However, the Indictment does not identify any of the alleged
coconspirators.  Not only does the Indictment's failure to provide this information "significantly
impair[] [Defendants'] ability to prepare [their] defense," but anything less than prompt
disclosure of this information "is likely to lead to prejudicial surprise at trial."  *See Rosa*, 891
F.2d 1066.

It is essential that Defendants have sufficient notice of the alleged coconspirators'
identities so that they can (i) understand the scope of the conspiracy charged in each count, and
raise a defense of multiple conspiracies; (ii) identify, from among the over seven terabytes of
discovery produced thus far, which statements the government might intend to introduce at trial,
whether directly through the alleged coconspirators' testimony or through out of court statements
allegedly made during and in furtherance of the conspiracy pursuant to Federal Rule of Evidence
801(d)(2)(E); and (iii) investigate the alleged role of any uncharged coconspirators and be
adequately prepared to challenge the government's characterization of such individuals as
"coconspirators."   For these reasons, the government should be compelled to identify any
alleged coconspirator whose statements the government intends to offer as proof of the alleged
conspiracy, either directly or indirectly through Rule 801(d)(2)(E).  *See United States v.
Barrentine*, 591 F.2d 1069, 1077 (5th Cir. 1979) (holding that "[a] bill of particulars is a proper
procedure for discovering the names of unindicted coconspirators who the government plans to
use as witnesses" and that "[i]t is not uncommon for the trial judge to require the government to
disclose their names when information is necessary in a defendant's preparation for trial");
*accord United States v. Morris*, 2008 WL 5188826, at *17 (W.D. Pa. Dec. 8, 2008) (granting
motion for bill of particulars seeking, *inter alia*, the names of all unindicted coconspirators

whom the government intended to call at trial); *United States v. Holman*, 490 F. Supp. 755, 762 (E.D. Pa. 1980) (granting motion for bill of particulars seeking, *inter alia*, the names of all alleged coconspirators).

## IV.   DEFENDANTS ARE ENTITLED TO DISCLOSURE OF THOSE PORTIONS OF THE GRAND JURY PROCEEDINGS RELATING TO CONDUCT FROM 1999 THROUGH 2006

Defendants respectfully request that the Court order a limited disclosure of certain aspects of the grand jury proceedings in this matter: specifically, those portions of the grand jury minutes that reflect the government's presentation of evidence, if any, regarding the allegations of fraudulent conduct in the period between 1999 and 2006.  A close reading of the Indictment and Seizure Affidavit raises a strong inference that the grand jury was not provided with any such evidence for the time period in question.[20]  As discussed below, an indictment for which the grand jury was provided with no evidence is irredeemably tainted and Defendants would suffer significant prejudice if forced to stand trial upon such legally deficient counts.  Accordingly, to the extent the grand jury was not presented with evidence to support the allegations as to the 1999 to 2006 time period, Defendants move for dismissal of the relevant portions of Counts 1 through 32.

Although grand jury proceedings are normally subject to strict secrecy requirements and a presumption of regularity, courts may authorize their disclosure where a defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  Such grounds include a lack of probable cause to indict, *see United States v. O'Shea*, 447 F. Supp. 330, 332 (S.D. Fla. 1978), or other prejudicial irregularities in the grand jury procedure, *see United States v. Frumento*, 405 F. Supp. 23, 33

---

[20] The Callahan Affidavit and the Woodring Affidavit are similarly devoid of factual allegations regarding purported fraudulent conduct prior to 2007.

(E.D. Pa. 1975); *see also United States v. Wolff*, 840 F. Supp. 322, 324 (M.D. Pa. 1993) (rejecting presumption of regularity where government statements indicated that the grand jury could not have had probable cause to indict).

In order to demonstrate that disclosure of grand jury materials is appropriate, a defendant must show "a particularized need for [the materials] which outweighs the public interest in secrecy," *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958)), and that the request is "structured to cover only material so needed," *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979); *United States v. Slade*, 2013 WL 3344341, at *4 (E.D. Pa. July 3, 2013).  Here, each of these requirements is satisfied.

### A.   The Lack Of Any Allegation Regarding The 1999 To 2006 Time Period Creates A Particularized Need For The Information Requested

A particularized need for grand jury material is established if "the material . . . is needed to avoid a possible injustice in [a] judicial proceeding."  *Douglas Oil*, 441 U.S. at 222; *see also In re Corrugated Container Antitrust Litig.*, 687 F.2d 52, 57 (5th Cir. 1982) (affirming disclosure of grand jury materials upon showing of a "need sufficiently compelling and particularized that disclosure is essential to avoid an injustice").  An indictment tainted by a deficiency such as the failure to present any evidence to the grand jury in support of probable cause is precisely the type of "injustice" contemplated by *Douglas Oil* and its progeny.[21]  Indeed, an indictment, or a portion of an indictment, that was returned without probable cause must be dismissed.[22]

---

[21] *See, e.g.*, *United States v. Hart*, 513 F. Supp. 657, 658–59 (E.D. Pa. 1981) (listing whether "evidence was presented to the grand jury" as one of several irregularities that a court "would need to consider" in determining whether a defendant has shown a particularized need for disclosure).

[22] *See* Fed. R. Crim. P. 12(b)(3)(A)(v); *O'Shea*, 447 F. Supp. at 332 (dismissing indictment where "there simply [wa]s *no evidence* sufficient to establish probable cause that the defendant .

Here, the Seizure Affidavit and the Indictment strongly suggest that the grand jury

proceeding suffered from a significant irregularity: namely, a complete absence of evidence

regarding allegedly fraudulent conduct between 1999 and 2006.  The Indictment asserts that the

alleged fraud in this case began "at the latest" in 1999, and was carried out by means of three

"stratagems."[23]  The Seizure Affidavit confirms the government's view that the alleged fraud

"*was accomplished*" by means of the conduct that comprises the three "stratagems" described in

the Indictment, but fails to provide any dates for the conduct other than by a cross-reference to

the Indictment.[24]  Yet, critically, the Indictment alleges that the earliest of these "stratagems"

began *no earlier than February 2007*.[25]  These statements, coupled with the Indictment's silence

regarding the method and means by which the alleged fraud was carried out prior to 2007, raise a

---

. . . committed any one of the three offenses of which he is charged" (emphasis added)); *Wolff*,
840 F. Supp. at 324 (dismissing indictment where the government's statements outside the
indictment made clear that the grand jury could not have heard evidence sufficient to support a
finding of probable cause).  *See also Costello v. United States*, 350 U.S. 359, 364 (1956)
(Burton, J., concurring) ("[I]t seems to me that if it is shown that the grand jury had before it no
substantial or rationally persuasive evidence upon which to base its indictment, that indictment
should be quashed."); *United States v. Johnson*, 767 F.2d 1259, 1275 (8th Cir. 1985) (observing
that, if "the grand jury heard *no evidence* competent to sustain [an] indictment," the indictment
may be subject to dismissal (emphasis added)); *United States v. Romero*, 585 F.2d 391, 399 (9th
Cir. 1978) (noting that "a complete absence of evidence" may be grounds to dismiss an
indictment).

[23] Indictment Count 1 ¶ 50.

[24] Grover Decl. Ex. 17 ¶ 21 (emphasis added) (incorporating by reference the Indictment).  In
pertinent part, the Seizure Affidavit avers that "[t]he diversion of the 'indates' from the clients to
GUARANTEED RETURNS was accomplished via GUARANTEED RETURNS' computerized
inventory system, using a program known as FilePro."  The Seizure Affidavit goes on to describe
the identical conduct alleged to constitute the three "stratagems," alleging that "the computer
programmer who wrote the code to accomplish this theft" did so by distinguishing between
"managed" and "unmanaged" indates based upon a so-called "managed table."  *Id.*; *see*
Indictment Count 1 ¶ 29 (noting that this alleged conduct began in 2007).

[25] The other two "stratagems" allegedly began in November 2010 and January 2011,
respectively.  Indictment Count 1 ¶¶ 35-39.

compelling inference that the grand jury was provided with no evidence regarding purportedly fraudulent conduct upon which to find probable cause to indict Defendants on charges that involve the period from 1999 to 2006.  Because the grand jury minutes are the *only* source of information from which Defendants and the Court can determine whether the grand jury proceeding was fatally flawed, Defendants have shown a particularized need for the materials requested.

**B.     The Public Interest In The Secrecy of These Grand Jury Proceedings Is Minimal**

The public's interest in the secrecy of these grand jury proceedings is minimal.  The Supreme Court has described "several distinct interests served by safeguarding the confidentiality" of the grand jury:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony.  Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements.  There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment.

*Douglas Oil*, 441 U.S. at 218-19.  The Court further held that the weight to be accorded to the above-described secrecy interests will vary based on the circumstances of the particular case.  *Id.* at 221-23.

Where, as here, Defendants have already been indicted and the grand jury's work is complete, secrecy considerations are "greatly reduced."  *United States v. Mahoney*, 495 F. Supp. 1270, 1276 (E.D. Pa. 1980); *see also Douglas Oil*, 441 U.S. at 222 (after the conclusion of a grand jury proceeding, secrecy concerns are "reduced").  In particular, there is no pending grand jury proceeding in this case that would be "interrupted [or] affected" by the disclosure requested here.  *See United States v. Smith*, 123 F.3d 140, 149 (3d Cir. 1997).  Nor are there "individual grand jurors," or, for that matter, "prospective witnesses" before the grand jury, who could be

51

influenced or deterred by disclosure.  *See Douglas Oil*, 441 U.S. at 219.  There is certainly no

risk that Defendants themselves will flee or otherwise frustrate the judicial process in this case,

as the Indictment has already occurred, all bail conditions have been complied with for nearly 12

months, and one defendant is a corporation that is physically incapable of fleeing in any case.

*See id.*  And, where, as here, it is likely that the evidence (if any) used by the government to

establish probable cause will be introduced at trial, the secrecy considerations are "very low"

indeed.  *See McDowell*, 888 F.2d at 289.[26]

Moreover, even if there were still a pending grand jury investigation in this case, the

above analysis would not change, as there is no realistic chance that disclosure of historical

minutes would affect an ongoing grand jury procedure.  Based upon grand jury minutes

disclosed thus far by the government as Rule 16 material, a key witness was a government agent

who presented hearsay of certain employees of Guaranteed Returns, and who is clearly immune

to any potential negative effect of the disclosure of the minutes.  Furthermore, any non-

governmental witness who already testified before the grand jury has provided sworn statements

that can be altered only at the risk of perjury charges.  Additionally, as the Court implicitly

determined less than two weeks ago when it denied the government's motion for a protective

order and ordered disclosure of employee statements, there is no basis to find a risk of witness

---

[26] Further, while we recognize that the interest in secrecy is not limited to the individual grand jury in the instant case but extends to grand juries generally, *see Douglas Oil*, 441 U.S. at 222–23, this generalized consideration may and should be subordinated, in the interests of justice, to the need for disclosure in particular cases.  *Id.*; *see also In re Corrugated Container*, 687 F.2d at 57 (where, *inter alia*, grand jury has disbanded, "generalized interests in grand jury secrecy are . . . more easily overcome").  This is just such a case.

intimidation.[27]  (Dkt. Nos. 96-97)  There is therefore no meaningful secrecy concern that weighs against the disclosure sought in this case.

### C.     Defendants' Request Is "Carefully Tailored" To Result In Production Of Only Limited Portion(s) Of The Grand Jury Minutes

Defendants' request for grand jury materials also satisfies the requirement that it be limited in scope and "carefully tailored" to result in production only of the "material[s] . . . needed."  *United States v. Shober*, 489 F. Supp. 393, 411 (E.D. Pa. 1979) (citing *Douglas Oil*, 441 U.S. at 222).  Defendants have requested only those records that reflect the government's presentation, if any, regarding the 1999 to 2006 time period for which factual allegations appear to be entirely absent from the Indictment.  These records should be simple to find and, if necessary, to redact appropriately so that the materials unrelated to the current motion are not disclosed.

We further note that the request at hand is not a broad and wide-ranging request for discovery masquerading as a request for grand jury disclosure, or a request based on mere conjecture or speculation.  *See, e.g.*, *Slade*, 2013 WL 3344341, at *4 (denying motion to disclose grand jury materials that amounted to "a fishing expedition").  Rather, this motion is based on the government's failure, in the Indictment and the various affidavits it has filed in connection with warrants issued in this case, to articulate any basis for a substantial portion of the charges.  Under such circumstances, this is precisely the type of narrow, cabined request for disclosure that fits well within the established precedent discussed above.

---

[27] In fact, if the witnesses are cooperators or government agents who will testify at trial, the minutes will ultimately be disclosed pursuant to the government's obligations under the Jencks Act, and thus will not remain secret in any event.

**D.      The Need For The Limited Information Requested Well Outweighs Any Interest In Secrecy**

In order to obtain materials that are ordinarily protected by the "traditional secrecy of the grand jury" the requesting parties must "show that the material they seek is needed to avoid a possible injustice in [a] judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222. "Once a party makes the required showing of [particularized] need, the district court must weigh the competing interests and order so much disclosure as needed for the ends of justice."    *In re Grand Jury Matter*, 682 F.2d 61, 64 (3d Cir. 1982)).

Here, for at least three reasons, the particularized need established above outweighs the "greatly reduced" secrecy concerns that apply to the grand jury minutes.  First and foremost, the record more than amply elucidates the danger that a substantial portion of the charges in this case were returned without probable cause.  To require Defendants to fight for their liberty (or, in the case of the company, for its survival) under such circumstances would violate Defendants' constitutional right to stand trial only as a result of an indictment returned by a grand jury on the basis of probable cause, and would result in great prejudice to Defendants.  *See Procter & Gamble Co.*, 356 U.S. at 682 (disclosure of grand jury materials should be made where "without the [materials] a defense would be greatly prejudiced or . . . an injustice would be done").

Second, it would be highly prejudicial during the trial in this matter for the government to argue to the jury that the alleged fraud took place over a period of thirteen years, for an indictment alleging such an extensive period of fraud to be described to the jury, or for Defendants to have to mount a substantial defense to these charges, if in fact the only evidence presented to the grand jury suggested a scheme that actually lasted well under half that time.

Third, in securing an order that permitted the seizure of a substantial sum of money that defendant Volkes possessed, the government relied heavily on the notion that an alleged fraud occurred not just between 2007 and 2011, but for a period that started considerably earlier. Thus, if there was no probable cause to believe that illegal conduct occurred before 2007, any support for the wholesale seizure of the assets in Volkes' bank account at Merrill Lynch, which was based upon the forfeiture allegations in the Indictment and the assertions in the Seizure Affidavit would be dramatically undermined.

In short, Defendants have shown a particularized need for the information requested that substantially outweighs the public interest in grand jury secrecy, and that such need can be satisfied only by a limited disclosure of those grand jury materials that touch on pre-2007 conduct.  We therefore respectfully request that the Court order disclosure of the minutes, if in fact any exist, reflecting the portion(s) of the grand jury proceedings in which the government sought to establish probable cause for the existence of fraudulent conduct between 1999 and 2006.  In the alternative, we request that the Court review the relevant portions of the grand jury minutes to determine whether the government presented any evidence of criminal activity during the period between 1999 and 2006.  To the extent that the minutes confirm that the grand jury was not presented with any evidence to support the allegation that a fraud took place during the 1999 to 2006 period, Defendants respectfully request that the Court dismiss those portions of the Indictment that reference or incorporate that period.[28]

---

[28] *See United States v. Mangiardi*, 962 F. Supp. 49, 53 (M.D. Pa. 1997), *aff'd*, 202 F.3d 255 (3d Cir. 1999) (dismissing a portion of a count as time-barred but allowing non-stale claims to proceed to trial); *United States v. Salerno*, 2011 WL 6141017, at *4 (M.D. Pa. Dec. 9, 2011) (dismissing a portion of a count); *see also* 18 U.S.C. § 3731 (providing for courts to dismiss counts in an indictment in whole or in part); *Sanabria v. United States*, 437 U.S. 54, 69 n.23 (1978) (addressing an appeal from the dismissal of a portion of a count); *United States v. Serafini*, 167 F.3d 812, 814 (3d Cir. 1999) (same).

## V.       THE ASSETS SEIZED BY THE GOVERNMENT MUST BE RELEASED

The Indictment contains two Notices of Forfeiture, each of which would require that

Defendants forfeit significant assets if convicted.  The first Notice of Forfeiture ("Notice #1")

seeks to forfeit all proceeds traceable to the alleged mail and wire fraud.[29]  The second Notice of

Forfeiture ("Notice #2") seeks to forfeit all property involved in or traceable to the alleged

money laundering conspiracy.  On the basis of the Indictment and the Seizure Affidavit, the

government has effected the pretrial seizure of the entirety of two Merrill Lynch bank accounts –

one belonging to Dean Volkes (the "Volkes Account") and one established in trust for Ashley

Judson (the "Judson Trust"),[30] the latter of which the government alleges was funded in its

entirety by the Volkes Account.  (The Volkes Account and the Judson Trust are collectively

referred to herein as the "Accounts.")  On the basis of the Indictment alone, the government also

has encumbered four parcels of real property by filing *lis pendens* against them, and has further

listed a boat among the forfeitable property in Notice #2.[31]

As a preliminary matter, in light of the failure of the Seizure Affidavit to establish

probable cause that a crime was committed, *see above* § I.B, the seizure of the Accounts, which

was based upon the infirm Seizure Affidavit, should be lifted.  In any event, given that the

money laundering count in this case must be dismissed for the reasons discussed above, the sole

---

[29] Notice #1 also references the alleged obstruction under 18 U.S.C. § 1512.  The Indictment does not appear to assert that Defendants received any financial proceeds from the alleged obstruction itself, but rather that the obstruction was simply ancillary to the conduct charged in the other counts of the Indictment.  Accordingly, when discussing whether the government has sufficiently traced assets to an underlying offense, we do not separately address Notice #1's incorporation of Section 1512.

[30] Ashley Judson is Dean Volkes' daughter.

[31] Although the boat has not been physically seized, the status of the title to the boat is unknown, and we presume that it too has been encumbered.

remaining basis for the pretrial seizure of any property is the notion that the property is traceable

to the fraud scheme alleged.  However, the government bears the burden of showing that the

seized property is the direct proceeds of the alleged fraud, and in its Seizure Affidavit the

government has failed to meet that burden.  Therefore, the Court should direct that all pretrial

seizures be vacated and that all encumbrances be lifted.  Further, even if the money laundering

count is not dismissed (such that Notice #2 is still in effect), the government has nonetheless

failed to demonstrate that the funds in the Judson Trust, the four parcels of the real property that

have been seized, or the boat were involved in or traceable to the alleged money laundering.  As

a result, the seizure of the Judson Trust should be vacated, and the encumbrances against the real

property and the boat should be released.

A.     **In Light Of The Inadequacy Of The Money Laundering Count And The
Government's Failure to Establish That The Seized Funds Constitute
Proceeds Of Fraud, All Seized Property Must Be Released**

If the Court determines that the Indictment fails properly to allege money laundering and

therefore dismisses Count 34, Defendants are entitled to the immediate release of all assets

seized or encumbered pursuant solely to Notice #2.  These assets would include all funds in the

two seized accounts that are in excess of the alleged direct proceeds of the fraud,[32] as well as the

four parcels of real property and the boat that have been encumbered.  The only remaining issue

then would be whether the government has demonstrated, under the proceeds theory set forth in

Notice #1, that it is entitled to the pretrial seizure of any remaining part of the Accounts.  As set

forth below, the government has failed to make the showing necessary for such a seizure.

---

[32] The total amount of money seized from the Accounts is well over $129 million.  This exceeds,
by over $13 million, the amount of proceeds the government alleges resulted from the supposed
fraud.  (*See* Indictment Count 1 ¶ 50)

###### 1.   The Government Has Not Adequately Traced The Seized Funds To The Alleged Fraud

Because the money laundering conspiracy count, as well as the corresponding Notice #2, must be dismissed as set forth above, the government may seize assets in this case pursuant only to Notice #1.  Section 981 of Title 18 of the United States Code, on which Notice #1 is predicated, permits the seizure of property that "constitutes or is derived from proceeds traceable to a violation of," *inter alia*, the mail and wire fraud statutes.  Thus, in order to seize the proceeds of an alleged crime – including at the pretrial stage, where by definition there can have been no finding of guilt – the government must demonstrate that the property sought to be seized is in fact traceable to the alleged offense.  *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158 (3d Cir. 2003) ("In forfeitures under section 981, the government is required to trace the seized property directly to the offense giving rise to the forfeiture.").

In securing the pretrial seizure of the sum identified in Notice #1, the government attempted to meet its burden by asserting, in the Seizure Affidavit, that the Volkes Account received a total of $92,684,589 from Guaranteed Returns, and that this amount "included commingled fraud proceeds."  (Grover Decl. Ex. 15 ¶ 42)  The government further alleges that the $92,684,589 that was received into the Volkes Account earned a total of $23,517,862 in income between 2001 and 2014.  (*Id.* ¶ 44)  Based on these assertions, the government contends that the Volkes Account contains "at least" $116,202,451 in the alleged fraud proceeds.

Nonetheless, the government's tracing analysis is wholly insufficient to justify the seizure that has occurred.  Fatally, the Seizure Affidavit makes no effort to quantify the amount of alleged "commingled fraud proceeds" that were paid into the Volkes Account and fails to distinguish between the funds in the account that are allegedly the proceeds of a crime and those that are untainted.  Instead, the affidavit merely notes the amount of money paid into the Volkes

58

Account by Guaranteed Returns during the course of the alleged scheme and asserts that such total amount "included" the alleged proceeds.  By definition, therefore, the total amount *also* included an unspecified amount of "untainted" funds, the seizure of which is not authorized by Section 981.  *See* 18 U.S.C. § 981(a)(1)(C) (permitting forfeiture of only "property . . . which constitutes or is derived from proceeds traceable" to a listed offense).  Similarly, the government fails to identify that portion of the $23,517,862 in interest which is traceable to the "untainted" funds that were transferred into the Volkes Account by Guaranteed Returns, despite the fact that interest from untainted funds cannot be subject to forfeiture.[33]

In *United States v. Voigt*, the Third Circuit confronted allegations very similar to those recited here.  89 F.3d 1050 (3d Cir. 1996).  In *Voigt*, because the government had alleged "numerous intervening deposits and withdrawals between the deposit of the tainted money" and the time the account was used to make a purchase, the court was forced to "conclude[ ] that *the government simply could not show*" that the resulting funds from the commingled account were "'involved in' or 'traceable to' the defendant's illegal activity."  *United States v. Stewart*, 185 F.3d 112, 129 (3d Cir. 1999) (explaining the holding in *Voigt,* 89 F.3d at 1084-87) (emphasis added).  So too here:  It is impossible to know from the limited evidence that the government has proffered in the Seizure Affidavit whether and what amount of the funds in the Volkes Account as of the date on which the seizure occurred represent alleged fraud proceeds, as opposed to untainted funds.  By extension, since (by the government's own allegation) all of the funds in the Judson Trust come from the undifferentiated Volkes Account, the government has failed to show which funds in the Judson Trust – if any – are the proceeds of supposed fraud.  Thus, as in *Voigt*,

---

[33] We also note that, should the Court determine that the Indictment's inclusion of the time period between 1999 and 2006 was unsupported by probable cause, *see above* § IV, the $38,006,976 contained in the Volkes Account as of January 2007, as well as the interest attributable to that amount, are ineligible for forfeiture as proceeds of an alleged offense.

the government's allegations are insufficient to support the seizure of *any* part of the Accounts as proceeds of alleged criminal activity.

        2.        **Because The Government Has Failed To Establish That The Funds In The Accounts Are Traceable To The Alleged Fraud, They Are At Best Substitute Assets, And Are Not Subject To Pretrial Seizure**

After surveying the inadequate evidence proffered by the government in that case, the *Voigt* court held that where allegedly tainted funds are "commingled in an account with untainted property . . . such that they 'cannot be divided without difficulty,' the government must satisfy its forfeiture judgment through the substitute asset provision." *Voigt*, 89 F.3d at 1087-88 (citation omitted). Here too, because the government has not distinguished, and apparently cannot distinguish, the funds it alleges to be tainted from the funds it alleges to be untainted, the allegedly commingled funds may be seized only as substitute assets. Yet substitute assets may be seized only *after* a criminal conviction in satisfaction of a forfeiture judgment and, even then, only if the traceable proceeds are insufficient to satisfy that judgment. *See id.* Critically, as the Third Circuit has repeatedly held, substitute assets *may not* be seized prior to trial. *See, e.g.*, *In re Assets of Martin*, 1 F.3d 1351, 1362 (3d Cir. 1993).[34] Because the government has failed to establish that the funds in the Accounts are anything more than substitute assets, those funds are not eligible for pretrial seizure and must be released.

        B.        **Even If The Money Laundering Count Survives, Portions Of The Property Seized As Property Allegedly "Involved In" Or "Traceable To" Money Laundering Must Be Released**

In order to seize property prior to trial under the money laundering statute, the government must demonstrate that the property is "involved in" or "traceable to" a money

---

[34] Although *Martin* addressed a provision of the Racketeer Influenced & Corrupt Organizations Act, the court observed that the relevant statutory provision is identical to 18 U.S.C. § 853(p), which is the statute that, under Notice #1, would be invoked to seize substitute assets in this case. *Martin*, 1 F.3d at 1358; *see* Notice #1.

laundering offense.  *See* 18 U.S.C. § 982(a)(1)(C).  In this case, the government cannot justify the pretrial seizure of the Judson Trust, the four real properties, or the boat named in Notice #2 (together, the "Secondary Property") on either ground.  In fact, upon reviewing each possible ground for forfeiture under Section 982(a)(1)(c), it is clear that the encumbrances upon the real property and the boat must be lifted, and the Judson Trust must be released.

First, the Indictment recites no factual allegations that suggest that the Secondary Property was "involved in" – in other words, was used to facilitate[35] – the laundering of alleged fraud proceeds.[36]  Specifically, the government has not shown how the trust account, the four properties, or a boat somehow facilitated any acts of money laundering.  Indeed, the government's own filings are to the contrary, for if funds were laundered by their transfer to the Volkes Account (as the government at least appears to allege), then the offense of laundering would have been complete at that point, and a subsequent use of the Volkes Account to purchase the secondary property or to establish a trust could not facilitate an already-completed crime. Accordingly, the government's seizure of the secondary property cannot be justified as the restraint of property "involved in" the money laundering conspiracy alleged.

Second, if the government's seizure is based on a "proceeds" theory – i.e., that the secondary properties were paid for by the alleged proceeds of money laundering – then the government must link the secondary property to laundered funds.  *See Voigt*, 89 F.3d at 1086-87-88.  Yet as noted above, because the government has alleged that the Volkes Account contained both tainted and untainted funds, it has crippled its own ability to trace the secondary

---

[35] *See Mendoza v. U.S. Customs & Border Prot.*, 2006 WL 2627925, at *2 n.6 (D.N.J. Sept. 13, 2006) (noting that the phrase "involved in" has widely been interpreted to mean "facilitates").

[36] In fact, the Seizure Affidavit does not reference the secondary property at all, much less justify its seizure, except insofar as it alleges that the Judson Trust was funded by the Volkes Account.

property to the proceeds of money laundering.  In fact, in *Voigt*, the court rejected the government's argument that the purchase of jewelry using funds in a commingled bank account would automatically render the jewelry forfeitable as proceeds of money laundering.  Rather, the court held, the government must trace the tainted proceeds to the purchase of the jewelry.  *Id.* at 1088.  The same result should apply here.  The government has not even attempted to trace alleged money laundering proceeds to the secondary properties, and, as discussed above, the government has failed to allege, much less demonstrate, that the real property or the boat were purchased with funds from the Volkes Account.  Accordingly, there was no legitimate basis to seize or encumber the secondary properties, and those properties must be released.  *See Martin*, 1 F.3d at 1362.

## VI.   COURT RECORDS CONCERNING GOVERNMENT WITNESSES SHOULD BE UNSEALED

By letter dated September 16, 2015, counsel for Guaranteed Returns asked AUSA Nancy Rue to agree to the unsealing of five documents that have been sealed in the criminal cases of two apparent government witnesses, Ryan Kasper and Ronald Carlino.[37]  (Grover Decl. Ex. 16) In a subsequent telephone conversation, Ms. Rue advised that these materials were sealed by the Court, and that, if Defendants were to request their unsealing, the government would oppose that request.  (Grover Decl. ¶ 20)  Because there is no applicable exception to the broad public policy favoring public access to judicial records, these documents should be unsealed.

---

[37] Kasper pled guilty on February 28, 2012 to four counts of an indictment pending against him. *United States v. Kasper*, 11 CR 00570 (PBT). The docket reflects that two documents on that date were sealed, number 15 (a "plea document") and number 16 (a "judicial document"). Carlino pled guilty on May 4, 2015 to four counts of the indictment in this case.  The docket reflects the filing of three documents under seal (numbers 70, 71, and 72), all apparently relating to the plea.

The Supreme Court recognizes both a common law right and a First Amendment right to open court proceedings and public access to court documents.  *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 608 (1978); *Press-Enter.Co. v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501, 508-09 (1984).  The First Amendment right to obtain access to judicial records is essential to ensure the transparency and legitimacy of the judicial process.  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 570-71 (1980).  Court proceedings cannot constitutionally be sealed from public scrutiny unless "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Press-Enter.Co. v. Superior Court of Cal., Cnty. of Riverside*, 478 U.S. 1, 13-14 (1986) (internal quotations omitted).[38]

The public's right of access to court documents extends to plea documents that are filed in court.  *See. Wecht*, 484 F.3d at 208 ("In general, the common law right attaches to any document that is considered a judicial record," which depends on whether, *inter alia*, the document "has been filed with the court" (internal citation omitted) (emphasis added)); *United States. v. Chang*, 47 F. App'x 119, 122 (3d Cir. 2002) ("Filing clearly establishes the status of a document as a judicial record" (*citing In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001)).[39] A criminal defendant has no less a right than any other member of the public to access a co-

---

[38] In *United States v. Gonzalez*, 927 F. Supp. 768, 773-76 (D. Del. 1996), the court noted that the Third Circuit had resolved questions of access to court records under both common law and First Amendment standards, and used both approaches in granting a news outlet access to documents related to the lab examiner in a criminal case.  *See also In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*, 913 F.2d 89 (3d Cir. 1990) (First Amendment); *United States v. Wecht*, 484 F.3d 194, 207-08 (3d Cir. 2007) (common law).

[39] *See also Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) ("In accord with the rulings of our sister Second, Fourth, and Ninth Circuits, we now find that plea agreements have traditionally been open to the public, and public access to them 'enhances both the basic fairness of the criminal [proceeding] and the appearance of fairness so essential to public confidence in the system.'" (citation omitted)).

defendant's plea or obtain transcripts of such a plea. *United States v. Danovaro*, 877 F.2d 583, 589 (7th Cir. 1989).

The Department of Justice policy with regard to open judicial proceedings provides that the "vital public interest in open judicial proceedings" creates a "strong presumption against closing proceedings" such as "plea proceedings." Far from encouraging the sealing of plea records, the Department of Justice manual acknowledges that "the Government has a general overriding affirmative duty to oppose their [sealing]." The manual forbids the government to move for the closure of such a proceeding unless "[n]o reasonable alternative exists for protecting the interests at stake," and then it may do so only if "[f]ailure to close the proceedings will produce (i) A substantial likelihood of denial of the right of any person to a fair trial; or (ii) A substantial likelihood of imminent danger to the safety of parties, witnesses, or other persons; or (iii) A substantial likelihood that ongoing investigations will be seriously jeopardized." 28 C.F.R. § 50.9.[40]

As discussed below, the government cannot make the showing necessary, under the case law or under its own guidelines, to justify continued sealing of the plea proceedings.

A.      **Common Law Right Of Access**

The common law right of access generally "attaches to any document that is considered a judicial record, which depends on whether [the] document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." *Wecht*, 484 F.3d at 208 (quotation and citation omitted). Common law right of access cases are resolved under a balancing framework. *United States v. Criden*, 648 F.2d 814, 820 (3d Cir.

---

[40] *See also* Tammy Hinshaw, *Right of Access to Federal District Court Guilty Plea Proceeding or Records Pertaining to Entry or Acceptance of Guilty Plea in Criminal Prosecution*, 118 A.L.R. Fed. 621 (1994).

1986).   In *Gonzalez*, the district court recognized that the Third Circuit had found a common law right of access to audio and video tapes admitted into evidence, transcripts of audiotapes even where the transcripts were not admitted, and transcripts of sidebar or in-chambers conferences during criminal trials.   927 F. Supp. at 773 (citing *Criden*, 648 F.2d 814; *United States v. Martin*, 746 F.2d 964 (3d Cir. 1984); *United States v. Smith*, 787 F.2d 111 (3d Cir. 1986)).   The Gonzalez court stated that "the burden is on the . . . party seeking to keep the documents sealed to demonstrate that the factors opposing access outweigh those favoring it."  *Gonzalez*, 927 F. Supp. at 776 (citation omitted).

In *Wecht*, the court noted that although there is a strong presumption in favor of the public's right of access to such documents, "parties [may] assert that the need for confidentiality outweighs this strong presumption" and that the Third Circuit "trust[s] trial courts to fairly balance the interests at stake."  *Wecht*, 484 F.3d at 208.   Thus, the Third Circuit has recognized that under certain circumstances, privacy or reputation interests might outweigh access – for example, disclosing names of unindicted co-conspirators could cause serious injury to innocent third parties.  *Id.* (citation omitted).  *See also United States v. Smith*, 2012 WL 6697650, at *1 (E.D. Tenn. Dec. 21, 2012) (granting consent motion to unsealing of co-defendant's plea, subject to protective order).  Here, the government can identify no reason for the continued sealing of the court records at issue, much less sufficient reason to overcome the "strong presumption" in favor of public access.  The government cannot credibly allege threats to the safety of any witness, which is the principal factor found in those rare cases that allowed such records to remain under

seal;[41] nor has the government alleged that there is an ongoing investigation that could be harmed by the release of the materials requested.

**B.      First Amendment Right Of Access**

First Amendment right of access cases consider whether there exists a compelling interest in non-disclosure and a narrowly tailored scope of such non-disclosure. *Gonzalez*, 927 F. Supp. at 773-74 (*citing Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 606-07 (1982) and *Press-Enter. Co.*, 464 U.S. at 509-10).

The Third Circuit has recognized a general right of access to court proceedings such as suppression hearings, entrapment hearings and due process hearings, bills of particulars, post-trial hearings into juror misconduct, and voir dire proceedings. *Id.* at 773. *See also United States v. Smith*, 776 F.2d 1104, 1111-12 (3d Cir. 1985) (applying First Amendment standard to bill of particulars). Although the Third Circuit does not appear to have directly addressed the First Amendment implications of sealed guilty pleas, other courts of appeals have done so and determined that plea hearings and agreements fall squarely within the category of court proceedings to which access must  be granted pursuant to the First Amendment. In *United States v. Haller*, the Second Circuit concluded that "there is a right of access to plea hearings and to plea agreements. . . . [S]uch access . . . serves to allow public scrutiny of the conduct of courts and prosecutors." 837 F.2d 84, 86-87 (2d Cir. 1988) (citations omitted). The Second Circuit accordingly extended the First Amendment right of access not only to plea hearings themselves, but also to "documents filed in connection with those hearings." *Id.* at 87

---

[41] Indeed, the Court has determined that there is no risk to the safety of witnesses in this matter, as demonstrated by its recent order requiring the government to turn over previously-withheld Rule 16 discovery to defendant Guaranteed Returns despite the government's submission of ex parte affidavits purporting to show such a risk. (Dkt. Nos. 96-97)

In order to seal documents protected by a qualified First Amendment right of access, the government must show "that the denial [of access] is necessitated by a compelling government interest, and is narrowly tailored to serve that interest."  *Gonzalez*, 927 F. Supp. at 781 (citation omitted).  Again, the government cannot identify any reason for the continued sealing of the court records at issue, let alone "a compelling government interest" which the sealing is "narrowly tailored to serve."

* * *

There being no government interest in continued sealing that could outweigh the public's right to access, Defendants respectfully request that the documents relating to Ryan Kasper's plea, appearing as items 15 and 16 at on the docket for *United States v. Kasper*, 11 CR 00570 (PBT), and the documents relating to Ronald Carlino's plea, appearing at items 70, 71, and 72 of the docket in this case, be unsealed.

## VII.   THE GOVERNMENT SHOULD PROMPTLY PRODUCE TO DEFENDANTS *BRADY* AND 404(B) MATERIAL

The government should produce *Brady* material immediately.[42]  By letter dated November 10, 2014, counsel for Guaranteed Returns wrote AUSA Nancy Rue to request, among other things, disclosure of *Brady* materials.  (Grover Decl. Ex. 17 at pp. 7-11)  Although the government has acknowledged awareness of its obligations under *Brady* and has agreed to comply with those obligations, the government has not confirmed that all known *Brady* material has been produced.  In fact, in the almost 12 months since the Indictment was unsealed, no such material has been identified by the government.  Defendants are entitled to know, "without

---

[42] Defendants' request for *Brady* material includes disclosures due pursuant to *Giglio v. United States*, 405 U.S. 150 (1972).  *See United States v. Maury*, 695 F.3d 227, 249 (3d Cir. 2012) (*Giglio* material is a form of *Brady* material).

undue delay," whether the government has acquired any such materials in the course of its five-year investigation, and whether such materials have been produced to the defense.

"It is well-settled that the government's obligations under *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] require it to disclose actual exculpatory evidence without undue delay." *United States v. Mais*, 2006 WL 3308429, at *3 (W.D. Pa. Oct. 30, 2006) (*citing United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983)). Indeed, in *United States v. Starusko*, the Third Circuit "affirm[ed] [its] longstanding policy . . . to ensure prompt compliance with Brady" and "flatly reject[ed] the notion, espoused by the prosecution, that 'it is the government, not the district court, that in the first instance is to decide when to turn over Brady material.'" 729 F.2d 256, 261 (3d Cir. 1984). To this end, it confirmed that "the district court has general discretionary authority to order the pretrial disclosure of *Brady* material to ensure the effective administration of the criminal justice system," commenting that such a rule "perpetuated [its] longstanding policy of encouraging early production." *Id.* (internal citations omitted). *Brady* requires the disclosure of exculpatory statements regardless of whether or not they have been reduced to writing. *Carter v. Rafferty*, 826 F.2d 1299, 1309 (3d Cir. 1987).

Due to the complexity of Guaranteed Returns' business, with thousands of clients and tens of thousands of transactions, anything other than immediate production of *Brady* material would serve no purpose other than to prevent Defendants' proper preparation of a defense, in defiance of the Third Circuit's entrenched policy of favoring "early production" of *Brady* materials, "without undue delay" and "in time for its effective use at trial." *Higgs*, 713 F.3d at 44. *See also United States v. Mariani*, 7 F. Supp. 2d 556, 563 (M.D. Pa. 1998) ("[E]xculpatory evidence may require additional investigation and research to establish the innocence of an accused . . . . Therefore, exculpatory evidence should be produced well before a trial.") (internal

68

citation omitted).  Accordingly, Defendants respectfully request that the government be ordered to produce immediately to Defendants all presently-known *Brady* material.

These same considerations argue for early production of materials under Rule 404(b).[43] Under the circumstances of this complex case, Defendants submit that disclosure no later than thirty days before trial should be directed.  *See, e.g.*, *United States v. Gray*, 2014 WL 546757, at *7 (W.D. Pa. Feb. 10, 2014) (noting that "what constitutes reasonable notice" under Rule 404(b) "will depend on the circumstances of each case" and finding "the government's commitment to provide notice under Rule 404(b) at least two weeks prior to trial is consistent with the case law interpreting the rule"); *United States v. Delle Donna*, 552 F. Supp. 2d 475, 499 (D.N.J. 2008), *aff'd in part*, 366 F. App'x 441 (3d Cir. 2010) (directing early production of Rule 404(b) material); *United States v. Lightfoot*, 2008 WL 3050300, at *2 (W.D. Pa. Aug. 5, 2008) (same).

---

[43] Defendants also request production, on the same schedule, of materials due under the Jenks Act (18 U.S.C. § 3500).  While Defendants acknowledge that the Court may not compel production of such material before a witness has testified, its early production is consistent with the orderly administration of the trial and may avoid trial delays. "[M]any federal prosecutors routinely turn over Jencks material a few days before the witness testifies," *Maury*, 695 F.3d at 248 n.18, and Defendants respectfully submit the government should be encouraged to make somewhat earlier production due to the unusual complexity of this case.

## CONCLUSION

For the forgoing reasons, Defendants respectfully move this Court for: (I) suppression of all evidence seized pursuant to constitutionally defective search warrants and a *Franks* hearing on the same; (II) dismissal of Count 34 of the Indictment charging conspiracy to launder money; (III) a bill of particulars; (IV) partial unsealing of grand jury proceedings; (V) release of assets currently subject to pretrial seizure; (VI) unsealing of court records concerning the guilty pleas of witnesses cooperating with the government; and (VII) prompt disclosure of *Brady* and 404(b) material.

Dated: New York, New York
      October 13, 2015

Respectfully Submitted,

**SCHLAM STONE & DOLAN LLP**

**By:**  /s/ Douglas E. Grover
      Douglas E. Grover
      Thomas A. Kissane

      26 Broadway
      New York, New York 10004
      Tel. 212.344.5400
      Fax 212.344.7677
      dgrover@schlamstone.com
      tkissane@schlamstone.com

**LAW OFFICES OF ANN C.
FLANNERY, LLC**

**By:**  /s/ Ann C. Flannery
      Ann C. Flannery

      1835 Market Street, Suite 2700
      Philadelphia, Pennsylvania 19103
      Tel. 215.636.9002
      Fax 215.636.9899
      acf@annflannerylaw.com

      *Attorneys for Defendant Devos Ltd. d/b/a
      Guaranteed Returns*

70

**MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.**

**By:**  /s/ Elkan Abramowitz
_____
Elkan Abramowitz
Robert M. Radick
Miriam L. Glaser

565 Fifth Avenue
New York, New York 10017
Tel. 212.856.9600
Fax. 212.856.9494
eabramowitz@maglaw.com
rradick@maglaw.com
mglaser@maglaw.com

*Attorneys for Defendant Dean Volkes*


**PROSKAUER ROSE LLP**

**By:**  /s/ Robert J. Cleary
_____
Robert J. Cleary
William C. Komaroff
Celia V. Cohen

11 Times Square
New York, New York 20036
Tel.  212.969.3000
Fax  212.969.2900
rjcleary@proskauer.com
wkomaroff@proskauer.com
ccohen@proskauer.com

*Attorneys for Defendant Donna Fallon*