# EXHIBIT 1

JAP:DCW

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M 1 1 -3 2 2

------------------ X

IN THE MATTER OF THE APPLICATION OF
THE UNITED STATES OF AMERICA FOR A
SEARCH WARRANT FOR THE PREMISES KNOWN
AND DESCRIBED AS:
SEIDEN, NY 11784; 100 COLIN DRIVE,
HOLBROOK, NY 11741;
AVENUE, DEER PARK, NY 11729; 101 13TH
AVENUE, RONKONKOMA, NY 11779; AND
CITIBANK, 835 MONTAUK AVENUE, BAYPORT,
NY

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT

M. No. _____

------------------ X

I, Joann M. Woodring, being duly sworn, hereby depose and state:

## I.     Summary

1.     The Department of Defense, Defense Criminal Investigative Service

(DCIS) and the Federal Bureau of Investigation (FBI) are investigating numerous criminal

schemes emanating from Devos, Ltd d/b/a Guaranteed Returns (Guaranteed Returns).

Guaranteed Returns is a "reverse distributor" of pharmaceutical products: health care facilities

send their expired or excess pharmaceutical products to Guaranteed Returns, with the expectation

that Guaranteed Returns will submit the pharmaceuticals to the appropriate manufacturers for

refund. Pharmaceutical manufacturers issued the refunds to Guaranteed Returns, which was

expected to deliver the funds, less a fee for its service, to the health care facilities via check or

direct deposit. Guaranteed Returns has its main place of business in Holbrook, NY and a

separate warehouse in Ronkonkoma, NY.

2.     As described in further detail below, Guaranteed Returns is a business

permeated by fraud. For at least the last ten years, Guaranteed Returns has increased its profits

by diverting its customers' returns to its own account, defrauding its customers of millions of dollars in returns each year.

        3.     In addition, Guaranteed Returns allowed one of its employees to steal more than one million dollars from the Department of Defense (DoD), through cancelling checks that were issued to DoD entities, and re-issuing them to a shell company controlled by the Guaranteed Returns employee and his confederates. When the DoD recognized the theft by the Guaranteed Returns' employee and served Guaranteed Returns with a federal grand jury subpoena for records related to the DoD contract, Guaranteed Returns embarked on a record destruction campaign, deliberately destroying years' worth of computer files that were responsive to the federal grand jury subpoena, in order to conceal its own diversion of pharmaceutical product and refunds.

        4.     The criminal schemes involving Guaranteed Returns, for which evidence will be found at the premises to be searched (described in paragraph 5, below), include:

        A.     theft by Guaranteed Returns' employee Ryan Kasper of checks issued to the Department of Defense for returned pharmaceuticals, in violation of 18 U.S.C. §§ 641, 1031, 1341, and 1343, among others;

        B.     a campaign by Guaranteed Returns and its upper management to destroy documents and computer files that were responsive to a Grand Jury subpoena, in violation of 18 U.S.C. §§ 371, 1512(b)(2)(B), 1512(c)(1), and 1519;

        C.     a scheme by Guaranteed Returns and individuals in its upper management to defraud the Department of Defense of the value of the products that the Department of Defense delivered to Guaranteed Returns under a prime contract, in violation of 18 U.S.C. §§ 371, 641 and 1031, and to defraud other customers of the value of their returned products, using the mail and interstate wires, in violation of 18 U.S.C. §§ 371, 1341, 1343 and 1349;

        D.     ███████████████████████████████████

E. ███████████████████████████████

5.      Investigation has shown that evidence of these crimes will be located at

the headquarters of Guaranteed Returns, 100 Colin Drive, Holbrook, NY 11741 (SUBJECT

PREMISES 1), and the warehouse used by Guaranteed Returns to store products that are not yet

ripe for return (so-called "in-date" product), which is located at 101 13th Avenue,  Ronkonkoma,

NY  11779 (SUBJECT PREMISES 2).   Additionally, evidence related to this investigation will

be found in safe deposit box number ██████ 0146 located at Citibank, 835 Montauk

Highway, Bayport,  NY 11705 (SUBJECT PREMISES 3).  Finally, evidence related to this

investigation will be found in computer files and computer media at the residences of the

information technology (IT) personnel who were tasked with the destruction of Guaranteed

Returns data responsive to the federal grand jury subpoena: ████████  ████████

████ Deer Park, NY 11729 (SUBJECT PREMISES 4) and ████████  ████████

████ Seldon, NY 11784 (SUBJECT PREMISES 5).  I know that SUBJECT PREMISES 4 is

the residence of ████████ based on database information including credit bureau

information and utility listings identifying his residence.  I have also confirmed that SUBJECT

PREMISES 4 is the address listed for ████████ driver's license and the registration of his

3

automobiles. I surveilled this address yesterday and saw that a vehicle registered to █████

█████ was in the driveway. I know that SUBJECT PREMISES 5 is the residence of

█████████████ by obtaining the address at which █████ listed on his driver's license and the

registration of his automobiles. I surveilled this address yesterday and saw that a vehicle

registered to █████████████ was in the driveway. The descriptions of each of these search

locations are provided in Attachment A and incorporated herein by reference.

6.　　This affidavit does not contain all of the information developed during the

course of the investigation, but only sufficient information to establish probable cause to search

each of the SUBJECT PREMISES.

## II.　Background of Affiant

7.　　I have been a Special Agent with the Defense Criminal Investigative

Service (DCIS) since March 2008. Prior to becoming a special agent I was an auditor with the

Defense Contract Audit Agency for more than seven years, and I am currently a licensed

Certified Public Accountant. I am a graduate of the Federal Law Enforcement Training Center

Criminal Investigator Training Program and the DCIS Special Agent Basic Training Program.

As a Special Agent with DCIS, I investigate fraud involving government contracts, the fraudulent

movement of money, and money laundering.

## III.　The Investigation

### A.　Theft of checks

8.　　This investigation began as a result of funds missing from the return of the

antibiotic drug Cipro by the District of Columbia Department of Health through Guaranteed

Returns, under a sole source contract between Guaranteed Returns and the Department of

4

Defense (DoD).  Under this contract, Guaranteed Returns was the exclusive provider of

pharmaceutical returns services for DoD and certain other federal government entities between

2001 and 2007.  Ryan Kasper, then the National Accounts Manager and Vice President of

National Accounts and Government Affairs at Guaranteed Returns, was the Guaranteed Returns

employee responsible for the DoD contract.  After 2007, DoD contracted with multiple vendors

for return pharmaceutical services.  Guaranteed Returns continues to be one of those vendors.

have conferred with the contracting officer from the Department of Defense and he has

confirmed that Guaranteed Returns continues to perform under the contract at SUBJECT

PREMISES 1 and SUBJECT PREMISES 2.

        9.     Under the DoD contract, Guaranteed Returns coordinated the return of

expired and recalled drugs to pharmaceutical manufacturers.  The drug manufacturer would

either provide a credit to the DoD (or the specific agency on whose behalf the return had been

made) or would issue a check to Guaranteed Returns for the returned product.  Guaranteed

Returns was then required under the contract to remit the funds to the DoD, or to the specific

agency designated by the DoD.  Guaranteed Returns received a fee of approximately seven

percent of the estimated return value for each return made.

        10.    Cipro is the primary drug of choice for exposure to anthrax.  The DC

Department of Health had purchased Cipro using funds from the Department of Homeland

Security for the District of Columbia First Responder (Bioterrorism) Supply.  In May 2005, the

DC Department of Health sought to return expired Cipro under the DoD contract with

Guaranteed Returns and requested that a check be issued (rather than a credit).  On May 12,

2005, the return of the Cipro was processed by Guaranteed Returns.  Ryan Kasper told the DC

Department of Health that the estimated return value of the returned Cipro was $675,446.67.

11.    The DC Department of Health contacted Ryan Kasper numerous times between 2005 and December 2007 to attempt to obtain the check for the returned Cipro. In response, Kasper repeatedly assured the DC Department of Health that he was looking into the matter and that the DC Department of Health would ultimately receive its funds, sending letters and emails to the DC Department of Health and to the Defense Supply Service Center (DSCP), the DoD contracting agency.

12.    Ryan Kasper left the employment of Guaranteed Returns in December 2007. In January 2008, Kasper's replacement at Guaranteed Returns stated that DSCP had already been paid for the Cipro. As proof, he provided copies of sixteen checks sent to DSCP which purportedly included the funds owed to DC Department of Health for the May 2005 return of Cipro. These checks included four checks payable to "Defense Medical Services." The Defense Medical Services checks were handwritten by Donna Fallon, the company's Chief Financial Officer.  Fallon asserted that she wrote the checks as replacements for checks printed through the normal course by the accounting system because Ryan Kasper had asserted that the original checks (made payable to DoD entities, the DSCP or the Veteran's Administration) had been written in the wrong name. In actuality, Defense Medical Services LLC is not related to the Department of Defense. It is a company incorporated by Paul Leight, on or about March 28, 2005. Leight is one of the principals of Clinicare Health Services LLC (Clinicare), which was a significant client of Guaranteed Returns also serviced by Ryan Kasper during his tenure with Guaranteed Returns.

6

13.     I have traced the checks made payable to Defense Medical Services and determined that these checks, as well as an additional check, were deposited into a bank account in Florida, opened by the principals of Clinicare. The total of the checks deposited to this account from Guaranteed Returns in 2005 and 2006 was $1,715,505.54. Checks for approximately forty percent of each deposit, a total of $691,865.06 in 2005 and 2006, were remitted to Rykas Industries, Inc. This company was an alter ego of Ryan Kasper, created in March 2005. The remaining amount, approximately 60%, went to Paul Leight and Kevin Singer, the principals of Clinicare.

**B.     Obstruction of Grand Jury Investigation through Record Destruction Campaign**

14.     As part of the investigation of the funds diverted from the Department of Defense to Kasper through the Defense Medical/Rykas shell companies, DCIS investigators visited Guaranteed Returns and interviewed Dean Volkes, its President and Chief Executive Officer, and his sister, Donna Fallon, the company's Chief Financial Officer. On September 14, 2009, DCIS investigators also served Volkes, as the Custodian of Records for Guaranteed Returns, with a federal grand jury subpoena for all records from 2001 to September 2009 related to Guaranteed Returns/DoD contract and returns, personnel records for all employees who worked on the DoD contract and returns, and all records related to the Guaranteed Returns' relationship with Clinicare.

15.     In response to the subpoena, the government received limited records. The government was informed by CFO Donna Fallon that paper records would never have been printed for these items. The grand jury subpoena required production of "all documents and

7

records, including in electronic format" related to the government contract. However, no computer inventory records were produced that pre-dated 2006. Fallon and Ronald Carlino, a senior Information Technology (IT) department employee of Guaranteed Returns, told DCIS investigators on March 31, 2010 that computer inventory records from 2006 and prior, including records that were responsive to the subpoena, had been destroyed in January 2010 as part of a "routine data purge" by Guaranteed Returns. They asserted that they did not know that they were required to preserve information that was subject to the subpoena.

16.     In November 2010, I interviewed a cooperating witness (CW1) who left the employ of Guaranteed Returns during 2010. CW1 stated that CW1 had been involved in the production of documents pursuant to the grand jury subpoena.

17.     CW1 stated that two IT department employees,                          and                          had been given a special assignment by CEO Dean Volkes after service of the federal grand jury subpoena to conduct a purge of the Guaranteed Returns computer system.       and       explained to CW1 that in order to effectively remove records, it was important not simply to delete the records, but also to write data over the deleted files, to be sure that the deleted data could not be recovered. CW1 asserted that       and       worked exclusively on the computer purge project while their regular work was undertaken by other personnel.

18.     CW1 also stated that while the grand jury subpoena had required production of personnel files related to persons who worked on the DoD contract, certain items from the personnel files were withheld by Donna Fallon in compiling the materials in response to the subpoena. These items were retained at Guaranteed Returns.

8

19.     CW1 stated that many management level employees and IT employees of Guaranteed Returns had remote access to Guaranteed Returns' computer system through a virtual private network (VPN) system. Through the VPN access, these employees were able to log on to Guaranteed Returns' computer system remotely from their homes. CW1 stated that both ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮▮▮▮▮ had VPN access. CW1 and CW2 both stated that ▮▮▮▮▮▮ and ▮▮▮▮▮ had VPN access to the Guaranteed Returns' computer system. CW2, a former employee who worked in the IT department, explained that when the second or third shift closed, either ▮▮▮ or ▮▮▮ had to close the shift and sometimes would do so from home. Both CW1 and CW2 stated that either ▮▮▮ or ▮▮▮ could handle computer problems when they arose. CW1 stated that in November 2010, CW1 spoke with a current employee at Guarantee Returns. The current employee stated to CW1 that the computer system had frozen up on the night shift and ▮▮▮ had been able to fix it from home. The employee concluded that ▮▮▮ had a server in his basement. However, I understand from this anecdote that ▮▮▮ was able to access the system from his home through the VPN system. Although CW1 left the employ of Guaranteed Returns in 2010, CW1 has been in frequent contact with current employees of Guaranteed Returns and CW1 has no indication that anything has changed with regard to either ▮▮▮ or ▮▮▮ employment or with regard to VPN access. Additionally, I have contacted the Department of Labor in February 2011, and the most recent information available shows ▮▮▮ and ▮▮▮ as recent employees of Guaranteed Returns. It is my understanding, from discussions with information technology and computer analysis staff within my agency and through discussions with agents at the Federal Bureau of Investigation (FBI) that VPN access will leave data files on the computer through which the access is made. Accordingly, the home

9

computers of both [REDACTED] and [REDACTED] will likely contain data related to Guaranteed Returns.

20.     Additionally, CW1 reported that Donna Fallon had taken the original of Ryan Kasper's personnel file, as well as other documents of Guaranteed Returns, and placed them in a safe deposit box at Citibank on Montauk Highway when Kasper left the company. Further investigation of this assertion determined that Donna Fallon opened box number

[REDACTED] 0146 at Citibank at 835 Montauk Highway, Bayport NY 11705 on April 18, 2008, in the name of Guaranteed Returns. I obtained the records for this safe deposit box on January 7, 2011, showing that the box continued to be held in the name of Devos Ltd DBA Guaranteed Returns. I confirmed this information, together with the proper identification of the account number for the box, on March 25, 2011. I have reviewed the safe deposit access records and these records show that the safe deposit box has not been accessed since it was opened.

21.     I also interviewed a former employee from the IT department, CW2. CW2 left Guaranteed Returns prior to the service of the grand jury subpoena. CW2 worked for Guaranteed Returns for more than five years. CW2 stated that during the entire time that CW2 had been employed at Guaranteed Returns, no data had ever been purged from the IT system. CW2 stated that backup tapes were created of Guaranteed Returns data on a regular basis. Additionally, the primary data server at the Holbrook headquarters was backed up every night to the computer at the warehouse in Ronkonkoma and the server in Ronkonkoma was backed up to the server in Holbrook. Accordingly, under the normal Guaranteed Returns data backup system, multiple copies of computer data from 2006 and before would have existed.

22.     I also interviewed CW3, a former vice president of Guaranteed Returns

10

who left Guaranteed Returns prior to the service of the grand jury subpoena. CW3 stated that Guaranteed Returns always maintained backup tapes, and that there was no routine purge of computer data while CW3 was at Guaranteed Returns.

**C.   Diversion of Refunds of "In-Date" Products to Guaranteed Returns**

23.   Interviews of four witnesses, all former employees of Guaranteed Returns, have made clear the motive for Guaranteed Returns and its senior management to destroy the records sought in the grand jury investigation: Guaranteed Returns had been involved for years in a fraudulent scheme to obtain "in-date" return product from clients and retain the corresponding manufacturers' refunds for itself.

24.   "In-date" product is product received for return from a client at Guaranteed Returns that is not yet ripe for return under a manufacturer's return policy. For example, a manufacturer may be willing to provide a refund on pharmaceutical products for a 9 month window, accepting products that will expire within the next 3 months or that have been expired for no more than 6 months. If a customer sends product to Guaranteed Returns that will be expiring in 4 months, that product is "in-date" and cannot yet be returned for credit. According to CW2, CW3, and CW4, all of whom had involvement in sales and marketing to clients of Guaranteed Returns, clients were told that Guaranteed Returns would accept "in-date" product, retain it until it was ripe for return under the manufacturer's policy, and then return it for the client's credit. Guaranteed Returns did sort "in-date" product. However, Guaranteed Returns routinely kept the resulting refund for itself rather than remitting the return funds to the client. CW1 confirmed this.

25.   CW1, CW2, CW3 and CW4 each stated that Guaranteed Returns President

11

Dean Volkes personally determined which clients would receive the funds for their "in-date" product and which clients would not. CW2, CW3 and CW4 each stated that the inventory control system, "File Pro," contained a field which designated whether "in-date" products would be refunded to the client or not. According to CW2, the computer flag included a field for "managed" and for "unmanaged." CW2 stated that this field was not on the data screens available to most employees. CW2 saw the flag field for managed and unmanaged and called IT manager             to ask what it meant.          told CW2 that CW2 should not be able to view that field. Shortly after the call, the field was removed from the data screen that CW2 was viewing.     explained confidentially to CW2 that the feld referred to "in-dates." Managed accounts were accounts where the Guaranteed Returns client was known to pay attention to their "in-date" product. These accounts routinely received credit for their "in-date" products when they were returned. However, "unmanaged accounts" were known by Guaranteed Returns to be relatively "unmanaged" – the client did not keep good accounting of its returned product. For unmanaged accounts, the "in-date" products were not refunded to the client. Instead, the inventory system would designate the products to a "GRX" store at the time that they were returned to the manufacturer. When the manufacturer sent Guaranteed Returns a check for these products, Guaranteed Returns would simply retain the funds for itself, and would not refund anything to its customer.

           26.      CW1 explained that when credit for "in-date" products was being diverted to Guaranteed Returns, the product was linked to "the GRX store" in the File Pro inventory system. CW1 stated that the GRX store was coded as store 242. CW1 provided this investigator with documents obtained from a Guaranteed Returns employee related to the "in-date" field and

12

the 242 GRX store.  One document was a note from CEO Dean Volkes to John Fallon,

warehouse manager at Guaranteed Returns and ex-husband of CFO Donna Fallon:

> Attached is a listing of Indates that need to be pulled and returned
> for the unmanaged group Humana (44460-28, Rightsource). The
> items are highlighted in blue and needs to be done on the next
> 44460 batch.  The product has most likely been reprocessed on
> ABC.  You will need to hand enter these items into 44460 batch
> then have ▮▮▮▮ update the Indate file for who it was reprocessed
> for.  How are you making out with the May build-in for the Baptist
> Medical group (3 accts, 21322-11836,16478,3767)? Thanks Dean

Attached to the note were the corresponding system printouts with handwritten annotations and
notes.

27.     This memorandum corroborates the existence of "unmanaged" accounts

for "Indate" product and the involvement of ▮▮▮▮▮▮▮▮▮▮▮ in addressing those

files.  According to my understanding of the "in-date" processing based on my interviews with

CW3, there would be no reason to "update the Indate file for who it was reprocessed for."

28.     CW1 also provided a page of handwritten notes obtained from the desk of

John Fallon by a current Guaranteed Returns employee entitled "Indate 10/1/2010."  The

handwritten note details 4 priorities related to indates.  The priorities confirm the existence of

store "242" as place for unmanaged indates and adding additional GRX stores for "every ABC

batch."  ABC has been identified during our investigation as AmeriSource Bergen, a

pharmaceutical wholesaler.  According to CW2 and CW4, return batches related to AmeriSource

Bergen were a common source of products that were diverted to the account of the "GRX" store.

29.     CW2, CW3 and CW4 explained that clients would occasionally contact

their sales representative to inquire about the status of "in-date" product.  If a client specifically

13

inquired, Guaranteed Returns would then issue a check to the client for the value of the product. However, if the client did not inquire, the funds remained with GR. CW2, CW3 and CW4 specifically stated that DoD accounts were accounts which were tagged as not being refunded to the client: Guaranteed Returns retained the funds owed to the DoD for "in-date" product.

D.

30.

31.

32.

14



33. █████████████████████████████████

34. █████████████████████████████████

E. ████████████████████

35. ███████████████████████████



36.

37.



38.

39.

## IV.   Evidence Will Be Found at the Subject Premises

40.    There is probable cause to believe that evidence regarding the violations described in Paragraph 4, above, will be found at SUBJECT PREMISES 1, 2, 3, 4 and 5.

41.   Based on my knowledge of Guaranteed Returns' business, including my interviews with current and former employees of Guaranteed Returns, my observations made at Guaranteed Returns during interviews I conducted there, my review of records received pursuant to the grand jury subpoena, as well as my training as a Certified Public Accountant and my experience in financial investigations, as well as the information I have obtained from speaking with other law enforcement personnel, including computer analysis specialists, I believe that Guaranteed Returns maintains records that will provide evidence of each of the crimes detailed above, as further detailed below.

42.   Specifically, Guaranteed Returns maintains financial records and inventory records showing what products were received into inventory, what products were transferred to SUBJECT PREMISES 2 for "in-date" storage, what products were destroyed as non returnable, and what products were returned to manufacturers. These records, together with personnel records, internal memoranda, and correspondence, are maintained at SUBJECT PREMISES 1.

43.   Guaranteed Returns also maintains records regarding funds received from manufacturers and amounts paid to its clients.

44.   Additionally, according to information provided by CW1, documents related to the coding of "in-date" product for the benefit of the "GRX store" have been reviewed at SUBJECT PREMISES 1 as recently as January 2011 by an employee of Guaranteed Returns who is still in communication with CW1.

45.   Under the DoD contract, Guaranteed Returns is obligated to retain records related to its DoD-related work for at least three years after termination of the contract. Guaranteed Returns is currently still operating under a DoD contract, and therefore, it should

18

have at least three years of records of its DoD returns, credits and refunds. These records are, according to my interview with Donna Fallon, maintained at SUBJECT PREMISES 1.

46.     Additionally, under Title 26, United States Code, Section 6001 and implementing regulations, a "person," which includes an individual, corporation or business, is required to maintain for at least four years, permanent books of record, sufficient to establish gross income, credits, deductions, expenses and other matters relevant to the filing of accurate income tax returns.

47.     Based upon my experience as a CPA, as well as my participation in numerous other financial investigations, and on the information and other experience of FBI and IRS agents with whom I have spoken, I have found that it is common practice in the business community to maintain business records journals, ledgers and other records showing the receipt and disposition of funds for many previous years. The following is a general list of records maintained by businesses and individuals:

- Bank records - bank statements, canceled checks, deposit tickets, and loan documents.

- Records of income - sales invoices, receipts, cash register tapes, and sales journals.

- Records of expenses - receipts, invoices, canceled checks, and journals and ledgers of expenditures.

- Records of asset acquisition and disposal - titles, deeds, receipts, and depreciation schedules.

- Financial statements - income statements, statement of cash flow, balance sheets, and income and expense projections.

- Inventory records - purchase receipts and inventory sheets and journals.

48.     I have also found that the flow of funds into and out of individual and corporate accounts can be tracked by tracing the paper trail. The paper trail is created by entries

19

into the business records by documents received or prepared to support a transaction, to record income, expenses, profits, assets and liabilities. I have also found that individuals and businesses typically maintain books and records where they are readily accessible, i.e., at their homes and places of business.

49.     I also know from my training, knowledge and experience, and information provided to me by other knowledgeable persons, that businesses such as Guaranteed Returns maintain in the ordinary course of business records that describe activities in detail, including, among other things, the services provided and items sold sells, invoices, sales records, vendor files, customer lists, shipment methods records, inventory, personnel records, and documents pertaining to the operation of the company. Accordingly, these records should be found at SUBJECT PREMISES 1.

50.     According to CW2 and CW3, Guaranteed Returns has a practice of backing up its computer system to tapes. According to CW2 and CW3, Guaranteed Returns has never previously destroyed backup tapes. Accordingly, backup tapes should exist at SUBJECT PREMISES 1 and 2. Moreover, according to CW3, maintaining a record of all "in-date" product is key to Guaranteed Returns' business model. Additionally, according to CW2, the data servers at SUBJECT PREMISES 1 and SUBJECT PREMISES 2 were redundant. Therefore, data that was deleted on one server would exist on the backup computer unless deliberately deleted. Accordingly, evidence regarding the fraud schemes outlined above should be present on the computer system at SUBJECT PREMISES 1 and SUBJECT PREMISES 2. Additionally, CW1 and CW2 stated that            and            both had VPN access to the Guaranteed Returns computer system from their homes. Based on my discussions with computer

20

forensic personnel, VPN access leaves electronic signatures and temporary copies of files on the hard drive of the computer conducting the access. Through VPN access, it is also possible to duplicate and retrieve data and store it on removable media, such as flash drives and compact discs. Accordingly, I have probable cause to believe that computers and electronic storage media containing evidence of the crimes set forth in paragraph 4 will be found at SUBJECT PREMISES 4 and 5.

        51.    If the data were deliberately deleted, the hard drives at SUBJECT PREMISES 1 and SUBJECT PREMISES 2 should show evidence of the deleted data, or of a campaign to overwrite that data. Any computer used in the deletion programming or process should show evidence of that use. Moreover, comparison of data files obtained through VPN access and stored on remote machines with the files available on Guaranteed Returns system will provide evidence of items deleted from the Guaranteed Returns system. Accordingly, evidence regarding the obstruction scheme outlined above should also be present on the computer system at SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT PREMISES 4 and SUBJECT PREMISES 5.

        52.    Based on information provided by CW1, I have obtained records from Citibank, at 835 Montauk Highway, Bayport, NY. Citibank has confirmed that Donna Fallon opened box        0146 on April 18, 2008 in the name of Guaranteed Returns and has not accessed that box since. According to CW1, Fallon placed records related to Ryan Kasper in the safe deposit box on the date that it was opened. Accordingly, I have probable cause to believe that records relevant to the crimes described in Paragraphs 4A and 4B, the theft of DoD funds and obstruction of justice, will be located in SUBJECT PREMISES 3.

21

53.     Accordingly, based on my investigation, there is probable cause to believe

that the following evidence is located at SUBJECT PREMISES 1, 2, 3 4 and 5:

1.     Internal correspondence, including electronic correspondence, locally stored e-mail and text messages between or among employees of Guaranteed Returns (including current and former employees) pertaining to or concerning the receipt and processing of returned pharmaceutical products,  inventory, the receipt and processing of refunds from manufacturers, the storage, processing, destruction or crediting of "in date" products, customer complaints, and reconciliation of items returned.

2.     External correspondence including electronic correspondence, locally stored e-mail and text messages between employees of Guaranteed Returns (including current and former employees) and wholesalers, or manufacturers or customers or their agents pertaining to or concerning the receipt and processing of returned pharmaceutical products, the receipt and processing of refunds from manufacturers, the storage, processing, destruction or crediting of "in date" products, customer complaints, and reconciliation of items returned.

3.     For each customer of Guaranteed Returns, records and electronic documents stored on permanent and removable media relating to the customer's contractual relationship, including

(a)     contract files, modifications, and task orders of individual customers;

(b)     records related to return transactions for creditable, non-creditable and "in-date" products including shipping documents, records created by Guaranteed Returns related to the receipt, processing, storage and disposal of products;

(c)     records documenting the return of pharmaceuticals and other products returned for credit and the related accounting records documenting the receipt of the credit including correspondence, price lists, credit memos and other related accounting records;

(d)     records of the calculation of the sales revenue recognized from each return and recorded pursuant to the terms of the subject contracts;

(e)     records of payments made by Guaranteed Returns to the customer and the supporting calculations of the individual amounts directed into the account of each customer including the amount returned, the amount obtained from the manufacturer and the amount of revenue recognized for each order; and

(f)     Records related to internal review, verification, inspection, audit of returned amounts,  credits and revenue recognized for the subject contracts.

22

4.      Licenses, permits, and compliance records relating to state and federal regulatory agencies, including the Drug Enforcement Administration and the state of New York.

5.      Internal monthly, quarterly and annual financial reports, compilation reports, audited and unaudited financial statements with footnotes, budgets and forecasts, and records showing Guaranteed Returns' assets, liabilities, income, expenses, transfer or distribution of Guaranteed Returns' funds

6.      Records reflecting company policies, procedures and training related to pharmaceutical returns

7.      Bank account records, including account statements, cancelled checks, checkbook registers and check stubs, deposit slips and receipts, certificates of deposit, safe deposit boxes, records of any loans and bank statements for checking, savings and other accounts held at financial intuitions in the United States of America and abroad.

8.      Personnel records for officers and employees, current and former, containing the full name, current or last known address, date of birth, Social Security Number, position, and home and work telephone numbers.

9.      Records reflecting storage locations or worksites for Guaranteed Returns, including passcodes and keys for such locations or sites.

10.     Records concerning or reflecting Guaranteed Returns' response to the receipt of any federal grand jury subpoena, including instructions to any employees regarding whether or how to comply with the subpoena.

11.     Records concerning or reflecting any instructions or commands to delete or overwrite data, erased data or metadata, or to destroy records of any kind.

12.     Records related to the backup of computer systems

13.     Computers, servers and computer-related equipment containing the records identified in paragraphs 1 through 12 above, including any and information instructions, programs and data stored in the form of magnetic, electronic, optical or other coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment.  This media includes but is not limited to disks/diskettes, flash cards, cartridges, tapes, optical medium, hard disk drives, solid-state devices and any other media that are capable of storing information or data, or of analyzing, creating, displaying, converting,

storing or transmitting electronic, servers, magnetic or optical computer impulses or data and any manuals software relating to such devices.  These devices include but are not limited to computers, computer components, computer peripherals, modems, monitors, speakers, printers, scanners, cameras, cell phones, personal digital assistants (pda's), mp3 audio players, wireless devices, Universal Serial Bus (USB) devices, Firewire devices and networking equipment; and any and software plus the manuals or instructions relating to such software as is used by the electronic devices or media previously specified in this attachment.

## V.    Search of Computerized Records

54.    I am aware, based on information provided to me by other law enforcement officers who specialize in computer evidence recovery, that conducting a search of a computer system, documenting the search, and making evidentiary and discovery copies is a lengthy process.  It is necessary to determine that no security devices are in place which could cause the destruction of evidence during the search; in some cases it is impossible even to conduct the search without expert technical assistance.  Since computer evidence is extremely vulnerable to tampering or to destruction through error, electrical outages and other causes, removal of the system from the premises will assist in retrieving the records authorized to be seized, while avoiding accidental destruction or deliberate alteration of the records.  It would be extremely difficult to secure the system on the premises during the entire period of the search.

55.    I am also aware, based on information provided to me by other law enforcement officers who specialize in computer evidence recovery, that whether records are stored on floppy disks, recordable CD-Roms, or on a hard drive, even when they purportedly have been erased or deleted, they might still be retrievable.

56.    I am also aware that when data has been deliberately destroyed, by over-writing the data, that process will often leave evidence that this has occurred.  Where, as

24

here, the deliberate obstruction of an investigation is at issue, that data is evidence of a crime. I understand that such data retrieval and analysis is time consuming and would add to the difficulty of securing the system on the premises during the search.

57.     I also understand, based on information provided to me by other law enforcement officers who specialize in computer evidence recovery, that the specialized accompanying software must also be seized, since it would be impossible without examination to determine that it is standard, commercially available software. In order to read the files and records, it is necessary to have access to the software used to create them. In addition, without examination, it is impossible to determine that the diskette purporting to contain a standard commercially available software program has not been used to store records instead.

58.     Based on the information set forth above, if a determination is made during the search that information contained in the computer or computer system, and related computer equipment and storage devices [together, the SUBJECT COMPUTER SYSTEM] cannot be successfully retrieved and copied to depict the exact environment in which the data was created at the premises, I seek authority under this warrant to seize the SUBJECT COMPUTER SYSTEM.

59.     If the SUBJECT COMPUTER SYSTEM is seized, the computer analysts will determine whether the items seized are necessary to retrieve and preserve the evidence and data. If it is determined that continued possession of the SUBJECT COMPUTER SYSTEM is no longer necessary to retrieve and preserve the evidence and data seized pursuant to this warrant, the government will return the SUBJECT COMPUTER SYSTEM.

VII.    **Conclusion**

60.    Based upon the foregoing facts, my training and experience, and the investigation conducted by myself and others, there is probable cause to believe that Guaranteed Returns, Dean Volkes, Donna Fallon and others are engaging in a scheme defraud the DoD, defraud others, and obstruct justice, in violation of 18 U.S.C. §§ 641, 1041, 1341, 1343, 1349, 1512(b)(2)(B), 1512(c)(1), and 1519.  There is also probable cause to believe that Ryan Kasper was involved in a scheme to steal funds from the DoD in violation of 18 U.S.C. §§ 641 and 1031, and that Clinicare is involved in a scheme to defraud pharmaceutical manufacturers in violation of 18 U.S.C. §§1341, 1343, 1349.  I have probable cause to believe that evidence of these crimes is located at SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT PREMISES 3, SUBJECT PREMISES 4 and SUBJECT PREMISES 5.

26

For the reasons set for above, a search warrant should be issued to search for all items listed in Attachment B, incorporated herein by reference, as fruits, instrumentalities and evidence of crimes described above.

Joann Woodring
Special Agent
Defense Criminal Investigative Service


Sworn to and subscribed before me
on this 29th day of March, 2011

HONORABLE MARILYN D. GO
United States Magistrate Judge

27

Attachment A

███████████████ Selden, New York 11784

Attachment A

100 Colin Drive, Holbrook, New York 11741

The business office and warehouse located at 100 Colin Drive, Holbrook, NY 11741 is further described as a one story white cement block building located on the corner of Colin Drive and Andrea Road.  There is a white sign containing the language "Guaranteed Returns" and the number "100" located on the north end of the building.  The main entrance consists of double glass doors located on the northeast corner of the building containing the language "Guaranteed Returns."  There is a grey door located on the southeast corner of the warehouse facing east, that is grey with a white square containing in black letters "GUARANTEED RETURNS."  On the southeast corner of the building facing south is a white warehouse bay door containing black letters "GUARANTEED RETURNS GROUND LEVEL RECEIVING." Also on the south side of the building are three additional white warehouse bay doors two of which contain in black letters "GUARANTEED RETURNS SHIPPING" and the eastern most door containing in black letters "GUARANTEED RETURNS" and a handwritten sign "LOOSE BOXES."

Attachment A

███████████████ Deer Park, New York 11729

Attachment A

100 13th Avenue, Ronkonkoma, New York 11779

The business office and warehouse located at 100 13th Avenue, Ronkonkoma, NY is further described as a one story light grey cement block building located on the west side of 13th Avenue between the Comac Loop.  There is a white sign containing the language "Guaranteed Returns" and the "100 13th Avenue" located on the east side of building.  The main entrance consists of double glass doors located on the east side of the building containing white numbers "100" on the left door and white letters and numbers "DEVOS LTD. GUARANTEED RETURNS 100 13th AVENUE RONKONKOMA, NY 11779" on the right door."  There is a glass door located on the south east corner facing the east with "employee entrance."  On the west side of the building is  the building facing south is a white warehouse bay door containing black letters "GUARANTEED RETURNS GROUND LEVEL RECEIVING." Also on the south side of the building are three additional white warehouse bay doors two of which contain in black letters "GUARANTEED RETURNS SHIPPING" and the eastern most door containing in black letters "GUARANTEED RETURNS" and the handwritten sign "LOOSE BOXES."

Attachment A

The safe deposit box ████████ 0146 located at Citibank, 835 Montauk Highway,
Bayport, NY 11705 Montauk Highway, Bayport, New York 11705, and is registered in the
name of Devos Ltd DBA Guaranteed Returns, as shown by the records of Citibank, set forth
below.

```
NSRMM05 NOVEMBER           NCIS - RELATIONSHIP PROFILE           07JAN11 13:35
                                ACCOUNT DETAIL
DEVOS LTD DBA GUARANTEED RETURNS          HH# / CLT#:       9662 /     2907
DEAN           VOLKES                     SSN\TAX ID:       6549
100 COLIN DRIVE                           ACCOUNT     :         0146
HOLBROOK, NY                    1174      PRIME  LOC: NYB-CITI NA (PIX)
                                          ACTUAL LOC: NYB-BAYPORT
                                          PHONE  NBR:
                                          STATUS    : RETAIN       SEGMENT: R
                                          ACQ   DESC: CITIBANK

     PRODUCT DESC: SAFE DEPOSIT
     PACKAGE     :
     MATURE\CLOSE:           ---------------- FINANCIAL HISTORY ----------------
     DATE OPENED : 04/18/2008  MONTH  EOM BAL   CNR  D | MONTH  EOM BAL   CNR  D
     CREDIT LINE : N/A         =====  =========  ====== = | =====  =========  ====== =
                  N/A          11/10     250      20   | 04/10     250      20
     TERM        : N/A         10/10     250      20   | 03/10     250      20
     RATE        : N/A         09/10     250      20   | 02/10     250      20
     YTD INTEREST: N/A         08/10     250      20   | 01/10     250      20
     YTD FEE     : 221         07/10     250      20   | 12/09     250      20
     BILL\PAY AMT: N/A         06/10     250      20   | 11/09     250      20
     % UTIL\PAID : N/A         05/10     250      20   | AVG       250      20
                                                                          09 OF 12
 PF1-HELP   PF2-JUMP   PF3-MENU   PF7-BWD   PF8-FWD   PF10-SELECT   PF11-SEARCH
```



SAFE DEPOSIT BOX SIGNATURE CARD                                    citibank

Box Number: 46-B    Open Date: 4/18/08  Title: DEVOS  LTD

LESSEE #1 (Box Owner)
Name:   DEVOS (T) DBA Guaranteed Returns
ID #1:                           ID #2:

LESSEE #2                                                  ☐ Co-Owner ☐ POA ☐ Deputy ☐ Trustee
Name:   Dean Vulkes
ID #1: NY                        ID #2:

LESSEE #3                                                  ☐ Co-Owner ☐ POA ☐ Deputy ☐ Trustee
Name:
ID #1: NY                        ID #2:

LESSEE #4                                                  ☐ Co-Owner ☐ POA ☐ Deputy ☐ Trustee
Name:
ID #1:                           ID #2:

* Check if 2 signatures required for box access     *If Non-Bank Customer Fill-in Non-Customer Lessee Profile Form

By signing below, you acknowledge that 2 keys to the box have been issued, and that you have received a copy of the Safe Deposit Box Rental
Agreement. You expressly agree that the rental of this safe deposit box, and the rights and duties of both you and Citibank, will be governed by
the terms and conditions of the agreement. You agree that if there is a dispute between us resulting from the rental of this safe deposit box
and you are unable to produce a copy of the agreement provided to you, Citibank may introduce evidence as to these applicable terms and
conditions through the use of internal bank records and need not produce a signed copy of your specific agreement.

Signature(s):
_____ Lessee #1          _____ Lessee #2

_____ Lessee #3          _____ Lessee #4

Attachment B

      1.     Internal correspondence, including electronic correspondence, locally stored e-mail and text messages between or among employees of Guaranteed Returns (including current and former employees) pertaining to or concerning the receipt and processing of returned pharmaceutical products, inventory, the receipt and processing of refunds from manufacturers, the storage, processing, destruction or crediting of "in date" products, customer complaints, and reconciliation of items returned.

      2.     External correspondence including electronic correspondence, locally stored e-mail and text messages between employees of Guaranteed Returns (including current and former employees) and wholesalers, or manufacturers or customers or their agents pertaining to or concerning the receipt and processing of returned pharmaceutical products, the receipt and processing of refunds from manufacturers, the storage, processing, destruction or crediting of "in date" products, customer complaints, and reconciliation of items returned.

      3.     For each customer of Guaranteed Returns, records and electronic documents stored on permanent and removable media relating to the customer's contractual relationship, including

    (a)    contract files, modifications, and task orders of individual customers;

    (b)    records related to return transactions for creditable, non-creditable and "in-date" products including shipping documents, records created by Guaranteed Returns related to the receipt, processing, storage and disposal of products;

    (c)    records documenting the return of pharmaceuticals and other products returned for credit and the related accounting records documenting the receipt of the credit including correspondence, price lists, credit memos and other related accounting records;

    (d)    records of the calculation of the sales revenue recognized from each return and recorded pursuant to the terms of the subject contracts;

    (e)    records of payments made by Guaranteed Returns to the customer and the supporting calculations of the individual amounts directed into the account of each customer including the amount returned, the amount obtained from the manufacturer and the amount of revenue recognized for each order; and

    (f)    Records related to internal review, verification, inspection, audit of returned amounts, credits and revenue recognized for the subject contracts.

      4.     Licenses, permits, and compliance records relating to state and federal regulatory agencies, including the Drug Enforcement Administration and the state of New York.

      5.     Internal monthly, quarterly and annual financial reports, compilation reports, audited and unaudited financial statements with footnotes, budgets and forecasts, and records showing Guaranteed Returns' assets, liabilities, income, expenses, transfer or distribution of Guaranteed Returns' funds

      6.     Records reflecting company policies, procedures and training related to pharmaceutical returns

      7.     Bank account records, including account statements, cancelled checks, checkbook registers and check stubs, deposit slips and receipts, certificates of deposit, safe

deposit boxes, records of any loans and bank statements for checking, savings and other accounts held at financial intuitions in the United States of America and abroad.

        8.      Personnel records for officers and employees, current and former, containing the full name, current or last known address, date of birth, Social Security Number, position, and home and work telephone numbers.

        9.      Records reflecting storage locations or worksites for Guaranteed Returns, including passcodes and keys for such locations or sites.

        10.     Records concerning or reflecting Guaranteed Returns' response to the receipt of any federal grand jury subpoena, including instructions to any employees regarding whether or how to comply with the subpoena.

        11.     Records concerning or reflecting any instructions or commands to delete or overwrite data, erased data or metadata, or to destroy records of any kind.

        12.     Records related to the backup of computer systems

        13.     Computers, servers and computer-related equipment containing the records identified in paragraphs 1 through 12 above, including any and information instructions, programs and data stored in the form of magnetic, electronic, optical or other coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes but is not limited to disks/diskettes, flash cards, cartridges, tapes, optical medium, hard disk drives, solid-state devices and any other media that are capable of storing information or data, or of analyzing, creating, displaying, converting, storing or transmitting electronic, servers, magnetic or optical computer impulses or data and any manuals software relating to such devices. These devices include but are not limited to computers, computer components, computer peripherals, modems, monitors, speakers, printers, scanners, cameras, cell phones, personal digital assistants (pda's), mp3 audio players, wireless devices, Universal Serial Bus (USB) devices, Firewire devices and networking equipment; and any and software plus the manuals or instructions relating to such software as is used by the electronic devices or media previously specified in this attachment.